Filed 12/5/16

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S131819 |
| v. | ) | |
| | ) | |
| GEORGE WILLIAMS, JR., | ) | |
| | ) | San Diego County |
| Defendant and Appellant. | ) | Super. Ct. No. SCD-172678 |
| _____ | ) | |

A 2004 jury convicted defendant of the 1986 first degree murder of 14-year-old Rickie Ann Blake (Rickie). It found true the special circumstance allegations of murder during the commission of a kidnapping, and murder during the commission of a rape. (Pen. Code, §§187, 190.2, subd. (a)(17)(B) & (C).)[1] The jury also found defendant guilty of forcible rape and kidnapping. (§§ 261, subd. (a)(2), 207, subd. (a).) Defendant admitted a prior serious felony conviction. (§§ 667, subd. (a), 1192.7, subd. (a).) After a penalty trial, the jury returned a verdict of death. On February 24, 2005, the court denied the automatic motion to modify the verdict (§ 190.4) and entered the death judgment. This appeal is automatic. (§ 1239, subd. (b).) The judgment is affirmed in its entirety.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

1

# I. FACTUAL BACKGROUND

## A. Guilt Phase

### 1. Overview of Prosecution Evidence

Rickie was in the eighth grade in 1986; she was less than five feet tall and weighed 120 pounds. She lived with her parents and older sister "Bootsie" on Oleander Avenue in Chula Vista. Rickie's older brother, Bobby, was overseas in the armed forces. Rickie was shy and afraid of the dark; she would not answer the door for anyone she did not know. She never drank and would not leave the house alone at night. She played with her Cabbage Patch dolls and was not allowed to date. Rickie had a "boyfriend," Henry L., an eighth grader who attended a nearby school. They spoke often on the phone, but had never kissed. She had no interest in other boys. Rickie and her best friend, Kristin, wrote letters to each other talking about "girl stuff."

One night, around 10:00 p.m., a man named George called asking for Rickie. Bootsie's friend, Angela Caruso, who took the call and thought the caller sounded like an adult, told him that he should not be calling a girl Rickie's age, and hung up on him.

On April 10, 1986, the day before Rickie was murdered, her father picked her up from school to take her to the dentist. When they returned home that evening, Rickie complained that her teeth hurt. She had soup and ice cream for dinner and took some aspirin to relieve her tooth pain. When her parents went to bed at around 9:00 or 9:30 p.m. that night, Rickie was watching a San Diego Padres baseball game on television. Her parents' bedroom door was closed. Bootsie and her two girlfriends returned home at around 10:30 p.m. and went outside with Rickie to talk. The girlfriends left, and Rickie and Bootsie went inside again. Rickie was talking on the phone to Henry L. and Kristin on a

2

three-way call. Bootsie locked the front and back doors and asked Rickie to get off the phone. Rickie hung up the phone and brought it to Bootsie in her bedroom. Around 11:00 or 11:30 p.m., the phone rang. Bootsie answered, and a man named George again asked for Rickie. He was not George Bell, their neighbor. Rickie retrieved the phone to take the call and returned to her bedroom with the phone. Bootsie fell asleep.

The next morning, Mrs. Blake woke up around 5:00 a.m. and found the front door open. The lights and the television were on. Rickie's shoes were near the front door, and she had not slept in her bedroom. Her Cabbage Patch dolls had not been changed into their pajamas, something Rickie did every night. The Blakes called neighbors and friends and then the police. Mr. Blake drove around looking for Rickie.

That same evening, after 10:00 p.m., a motorist found Rickie's body on the Main Street off-ramp of Interstate 15 in San Diego County. Rickie was lying on her back; her face had been beaten. She had bruising around her left eye and cheek and slight bruising on her chin and lip. She was wearing a pink sweatshirt, black pants, and dirty socks; she was not wearing shoes. There were bloodstains on Rickie's sweatshirt collar, on the white tank top she wore underneath the sweatshirt, and on her bra straps. Her black pants and underpants had the odor of urine. It appeared that Rickie had not been killed where her body was found.

Near Rickie's body, police discovered two footprints and two beer cans. No fingerprints could be recovered from the beer cans. In the roadway, police discovered tracks from the rear wheels of a truck and a series of droplets that appeared to be fluid from a vehicle. Forensic testing could not determine whether the droplets were transmission fluid or motor oil.

Angela Cardenas, Rickie's friend, identified a photograph of defendant, an African-American male, as a person she had seen at Skateland, a Chula Vista

3

skating rink where Rickie sometimes roller skated and that Bootsie frequented. Bootsie also identified defendant as a person she had seen at the skating rink. In 1986, both the owner of the rink and a longtime employee identified a photo of defendant as someone who looked familiar to them. The owner did not know Rickie, but knew Bootsie. The employee did not personally know Rickie or her sister and could not identify anyone in the courtroom, but he testified that he believed he had seen a person pictured in a photo exhibit standing outside the rink. The person in the picture was Augustus Salton, a security guard for the rink, who identified a photo of defendant as a person he had seen standing or walking around outside the rink in 1986. Defendant was a good roller skater and went to the skating rink regularly.

### 2. *The Autopsy*

On April 12, 1986, Dr. John Eisele performed Rickie's autopsy. He found light linear marks above Rickie's breasts, indicating that something was pressed up against the upper area of her chest when lividity was forming. Rickie's tank top and bra were both pulled above her breasts, which accounted for the light linear marks. Rickie's left eyelid was swollen and bruised from blunt trauma, like a punch, and there was bruising in the inside lining of the eyelids of both eyes. The bruising in the right eye was consistent with trauma to the eye or squeezing of the neck that collapsed the jugular vein. The trauma to the mouth was consistent with injuries caused by a beverage bottle. On the left side of Rickie's neck, beneath her chin, there was some bruising and a small scrape; there was also a small linear scrape on the left side of her neck. Pressure or squeezing, rather than a blow, would have caused these neck injuries. Hemorrhaging was found on her forehead area, and the injuries indicated three separate impacts from a blow or object that could have caused unconsciousness. The blunt object was either a fist

4

or a board.  The hemorrhaging could also have resulted from her head being slammed down on a hard flat surface.  The soft tissue of Rickie's neck showed several areas of hemorrhage, consistent with her neck being squeezed by hands, a ligature, or some other item.

Dr. Eisele observed no injuries or abnormalities in Rickie's genital exam.  He did see spermatozoa heads on a microscopic slide from a swab taken from Rickie's vagina.  The heads alone without the tails meant the sperm had started to degenerate.  Dr. Eisele estimated the time of Rickie's death to be between 1:00 a.m. on April 11 to between 12 and 24 hours before Rickie's autopsy on April 12.  He estimated that the sperm had been deposited between 48 to 72 hours before Rickie's death.  Rickie had a .04 blood-alcohol level that could have been due to a combination of alcohol ingestion and decomposition, although on cross-examination at trial Dr. Eisele admitted that in December 2003, and again in September 2004, he had concluded that the alcohol was attributable to decomposition, not consumption.  He also concluded that the cause of death was asphyxia by strangulation, although he noted that death by suffocation was also a possibility.

Dr. Glenn Wagner had been the San Diego County Medical Examiner for 14 months at the time of defendant's trial.  He reviewed the materials in the coroner's case file, including Dr. Eisele's autopsy findings and the investigative report.  Dr. Wagner opined that Rickie's death occurred in the morning hours of April 11, 1986, between midnight and 9:00 a.m.  He observed that Rickie's bra was displaced at or close to the time of her death.  The injuries to her mouth, fluid he found in her lungs, and the .04 blood-alcohol level in the vitreous humour were consistent with her being force-fed alcohol that went into her lungs.  Dr. Wagner concluded that the cause of Rickie's death was manual

5

strangulation, and the bruising on her neck and face occurred before her death. He also noted that the fluid in her lungs suggested drowning as a contributing factor.

In contrast to Dr. Eisele's original testimony, Dr. Wagner saw an intact sperm present on a slide made from the swabs of Rickie's vagina, and concluded she was sexually assaulted. Dr. Wagner opined that the sexual assault occurred within 24 hours of the slide preparation. He testified that the average intact sperm could last post mortem for 23 hours, but could last longer if the victim's body was refrigerated. He opined that sperm with heads alone could last 96 hours after the victim's death, with an average lifetime of 38.4 hours. He also testified that Rickie's blood-alcohol level was due in part to ingestion and in part from decomposition. He noted that Rickie had still not had her first period.

### 3. DNA Results

Although deoxyribonucleic acid (DNA) testing did not exist in 1986, such testing was conducted in 2002 and 2003 on Rickie's pants and the underpants she was wearing when found. The tests were positive for sperm and showed one donor. A reference sample from defendant was tested in March 2003 following defendant's arrest, several years after the DNA data bank found a match between defendant's DNA profile and the sperm samples from Rickie's underpants. Defendant's DNA matched the sperm fraction on the underpants. The sample had 13 exact matches with defendant's DNA using the short tandem repeat (STR) technique. Gary Homer, a private forensic serologist, compared defendant's DNA sample with the sample taken from Rickie's underpants. Using the highly predictive restriction fragment length polymorphism (RFLP) method, he found the samples matched. In addition, Annette Peer, a DNA analyst for the San Diego Police Department, testified that on March 12, 2003, she performed DNA testing with a known reference sample from defendant and a

6

DNA sample from the crotch of Rickie's underpants and got a match. Peer stated that the statistical probability of a random match was such that the only reasonable inference was that the sperm taken from Rickie's vaginal swab and her clothing were from defendant. Using the tests and all 13 markers, the probability of a match in the general population matching the sample would be one in 1.14 quadrillion for African-Americans, one in 1.4 quadrillion for Caucasians, and one in 161 trillion for Hispanics. The defense did not dispute the DNA evidence and findings.

### 4. Defendant's Statements to Police

Defendant was arrested for Rickie's murder in Gary, Indiana on February 11, 2003. He claimed that he did not know anything about Rickie's murder and that he did not know her. When asked how his sperm got into Rickie, defendant said, "I didn't kill her." When asked if he had sex with her but was embarrassed to discuss it, he said no, and "I didn't do nothing."

### 5. Uncharged Sexual Misconduct

#### a. 1984 molestation of daughter

In 1984, when defendant's daughter I. was six years old and living with defendant, her mother, a sister, and a brother, defendant molested her by rubbing lotion on her vaginal area when her mother was not at home. When I. said, "Daddy, daddy," in an effort to get him to stop touching her, defendant left the room. He was drinking alcohol and sitting on the floor in a fetal position, rocking back and forth, when her mother returned home. I. told her mother she was not feeling well and that defendant had rubbed lotion on her and given her a Piña Colada to drink. I. also told medical personnel and the police what happened. I., her mother and her siblings moved to San Diego without

7

defendant shortly after the molestation occurred. Defendant eventually pled guilty to the molestation in court.

### b. Rape of Velma W. and her six-year-old daughter Alicia C.

Velma W. testified that in 1986 she lived in an apartment building across the hall from defendant's wife (who at this point was separated from defendant). Defendant visited his wife two or three times a week, and Velma knew who he was but had no interaction with him. On the evening of April 18, 1986, defendant followed Velma into her apartment, threatened her with a knife, and bound her wrists with a curling iron cord and her ankles with the phone cord. He poured baby oil on her vagina and on her anus and vaginally raped her, using the knife to cut some of her pubic hair. Defendant then told her to turn over and sodomized her. Defendant retied Velma's hands behind her, retied her legs, and then tied her hands and legs together. Defendant then asked Velma who else was in the apartment, and she told him her girls were asleep in their room; Velma begged defendant not to do anything to her girls. But defendant left the bedroom, and a few minutes later, Velma heard a girl's scream coming from her daughters' room. When defendant left the girls' bedroom, he returned to Velma's room and vaginally raped her again. He then fell asleep, and Velma was able to untie her wrists and legs, picked up defendant's knife, grabbed some clothes, and went to the girls' room. There was a pool of blood in six-year-old Alicia's bed. Velma left with the girls and called the police. She had taken her keys with her and was able to lock the door so that defendant could not get out without a key. Police apprehended defendant in Velma's apartment. Velma and her daughters were treated at the hospital. (During the penalty phase, Alicia testified about defendant's assault on her.)

Dr. Marilyn Kaufhold, a pediatrician at Children's Hospital, testified that her examination of Alicia revealed a raised circumferential linear mark on her wrists, consistent with the use of some form of restraint. Dr. Kaufhold testified that Alicia's injuries were more consistent with a partial penetration of her vagina by a penis rather than by a finger.

### 6. *Defense Evidence*

Defense counsel presented a two-part defense: (1) that George Bell was the likely killer, and (2) that Rickie had consensual sex with defendant several hours before the murder, and that consensual sex was the source of defendant's DNA found in Rickie's body. In his opening statement, defense counsel told the jury that Dr. Eisele would testify that the sperm evidence showed that intercourse between defendant and Rickie took place more than two days before her death. He also said that Rickie's neighbor, George Bell, was the real killer. Defendant had made this claim to the police shortly after his arrest at the same time that he told police the sex he had with Rickie was consensual. Bell's estranged wife, Gloria Z., testified that Bell talked about Rickie's murder more than 50 times after they married in 1993. Bell would cry when he discussed the murder and say it was an accident. Gloria told police that Bell once told her that he would put her six feet under and that he had done it before. She also told police that Bell hated cats. She stated that Bell had strangled many neighborhood cats (Bell denied the accusation), and was on his way to strangle Rickie's cat one night when the cat was meowing outside, but Rickie opened the door and let the cat into the house.

Bell also told Gloria that Rickie had a tire mark on her face, that her body was dumped on Main Street, and that Rickie's glasses were in the trunk of a car that was crushed at a junkyard. The car apparently belonged to a mechanic named Greg Richardson, who lived a block from Rickie's house. When Gloria

9

asked Bell if he had committed Rickie's murder, Bell remained silent. Bell was also violent toward Gloria; he hit her once, sending her to the hospital, and raped her a couple of times. He refused to visit his stepfather's grave at the cemetery where Rickie was buried, but blamed Richardson for Rickie's murder.

Greg Richardson had worked on Bell's car, which leaked pink transmission fluid and black engine oil. He asked Bell directly if he killed Rickie, and Bell said nothing. Bell told Richardson in the garage that Rickie's death might have been an accident that occurred when someone tried to have sex with her, put their hand over her mouth, and accidently suffocated her. He also told Richardson that he was with his girlfriend, Angela "Tink" Armstrong, and had dropped her off at 9:00 p.m. on the night Rickie disappeared. He said he returned home at around 10:30 or 11:00 p.m. that night. Armstrong testified at defendant's trial that she was in Los Angeles for a funeral on April 10 and 11 of 1986, and that she did not see Bell when she was in town. Bell spoke to other neighbors about Rickie's death, saying that it was an accident or that Richardson did it.

Defense counsel's opening statement also claimed that Rickie had a prior relationship with a high school student named George, whom she introduced to her friend Ramy at the skating rink. Ramy testified that when the police told her that the suspect in the case was George Williams, she looked on the Internet and saw defendant's photograph. Apparently, defendant did not look like the boy named George to whom Rickie introduced her, because defendant was older. The parties stipulated, however, that the photograph (exhibit No. 60) was an Army photograph taken in 1974, when defendant was 19 years old. Ramy identified defendant in court as the person named George to whom Rickie introduced her at school.

10

Defendant presented additional support for his claim that he did not murder Rickie with the testimony of Jerry Chism, a retired criminalist. Chism compared the photograph of the right shoe print found at the murder scene with a photograph of defendant's right bare foot. He concluded that defendant's shoe did not make the shoe print at the scene. Defendant's feet indicated he wore a size seven or eight shoe, and the shoe print was 15 inches long. Chism believed that a size 19 shoe would have made the shoe print.

### 7. *People's Rebuttal Evidence*

Rickie's mother testified that on the morning Rickie was discovered missing, she called Bell's home and asked whether Rickie was there. Bell gave the phone to his mother and ran to the Blakes' house. The police were present. Bell's girlfriend Armstrong testified that Bell was like an older brother to Rickie. Many of the people in the neighborhood got together in the park and discussed what might have happened to Rickie. Bell never indicated to his sister that he was involved in Rickie's murder. He did tell her that he was sorry about what happened to Rickie and would get emotional when speaking about it.

### B. Penalty Phase

#### 1. *Prosecution Evidence*

##### a. *Other sexual assaults*

###### i. *1981 rape of Sandra S.*

On November 13, 1981, defendant raped 15-year-old Sandra S., who lived with her family in Compton. She met defendant because he and her brother worked at the naval shipyard. The rape occurred after Sandra had been sitting in a van at her house with defendant, her brother, her sisters, and a couple of friends. Sandra accompanied defendant on a drive. Defendant said they were

11

going to a store, but defendant drove instead to a deserted, dark area, forced her into the back of his van, ripped off her clothes, and raped her. Sandra ran from the van and spotted a police car. She told an officer that defendant had raped her. Defendant was apprehended after the police spotted his van. Sandra testified at defendant's preliminary hearing, but did not return for the trial because she wanted to put the incident behind her.

### ii. *1985 rape of V. R.*

V. R. joined the Navy in 1984 and met appellant on the base. On June 13, 1985, she went out with defendant and a friend for drinks. Later that evening the three were drinking and driving. After defendant dropped off the friend, he drove to a freeway overpass and told V. R. that he wanted to have sex with her. When she refused, he tied her up with his belt and some shoelaces and raped her. He then drove her back to the base. V. R. eventually reported the rape to her commanding officer and the police.

### iii. *Rape of Alicia C.*

Alicia C. described the night of April 18, 1986, when defendant sexually assaulted her after he raped her mother. Defendant entered her bedroom, where she and her four-year-old sister were sleeping. He put a sock in her mouth and took her to the bathroom, where he sodomized her. Defendant then took Alicia into another room and raped her vaginally. She ended up on the living room floor. Later her mother found her and hurried her and her sister out of the apartment. Velma W. called the police and took Alicia to the hospital, where she stayed for three days due to the substantial bleeding and tearing of her vaginal wall. Dr. Marilyn Kaufhold, who examined Alicia in the hospital, also found general bleeding in her urethra. A few days later, Alicia had painful vaginal blisters and a fever, and she was diagnosed with herpes.

iv. *1998 molestation of Leon F.*

Leon F. was defendant's male cousin, who lived in Indiana. In February 1998, 14-year-old Leon was staying with his aunt, his cousin, and defendant's son. Leon, his cousin, and defendant's son went to sleep on the floor of the den. Leon woke up to find defendant behind him, pulling his hand out of the back of Leon's pants. Leon felt a sharp pain in his anus, and he went to the bathroom, where he felt moisture close to the site of the pain. When he returned to the den, defendant was gone. Leon told his cousin about what had occurred, and was interviewed by the police. A criminal case was filed against defendant.

b. *Victim impact testimony*

Bootsie testified that Rickie's death affected her immensely, and she had trouble trusting people and difficulty remembering Rickie, with whom she had been very close. Bootsie had one of Rickie's Cabbage Patch dolls at her wedding, and went to the cemetery on Rickie's birthday. Their mother would daydream about Rickie, and before their mother died, she said she was going to see Rickie.

William Blake, Rickie's father, testified that before she died, Rickie was shy but had started to become more outgoing. She played with her dolls, sang in the choir, and played soccer; she was never any trouble and was a happy member of the family. William and his wife could not bear to clean out Rickie's room and were sad all the time. However, William reported that he was happy and relieved when he learned that there had been an arrest in Rickie's murder.

2. *Defense Evidence*

Several members of defendant's family, including his mother, Lelar Drew (Lelar), testified about his childhood with a drunken and abusive father who would not stay too long in the family unit. Defendant did not see his father often, and he and his mother were kicked out of successive family homes. His

13

mother was on welfare. When defendant's mother was in a relationship with John Small, a married man and alcoholic, she and Small argued a lot and got into physical fights in front of defendant. When defendant misbehaved, his mother hit him. Although defendant was placed with Annie Whitfield in foster care at his mother's request, he was returned to her when she took a job in Chicago. Lelar continued to have violent relationships with men.

Defendant's aunt and Lelar's sister, Yvonne King, testified that defendant was a kind child who would help people fix things. She testified about Lelar's past, including the fact that her father, defendant's grandfather, an alcoholic, was violent when he drank and would beat his children with a belt. Defendant's grandfather worked in a steel mill, and his grandmother worked as a maid. They had been sharecroppers living in a shack before they moved from rural Arkansas to Gary, Indiana seeking jobs in the steel mills. They lived in poverty, and when defendant's grandmother died of a stroke, his grandfather became extremely abusive. He eventually moved to the South, leaving defendant's mother and her sister to live with their abusive Aunt Francis, who beat Lelar regularly with extension cords. At 17 years old, Lelar married defendant's father, who was also an alcoholic. He left them before defendant's birth. Yvonne also testified that when defendant's mother became pregnant with defendant, her Aunt Francis hit her with a cord and kicked her out of the house. After George's birth, Yvonne said she only saw Lelar drinking one time. Lelar and defendant moved from house to house while on welfare.

The defense proffered evidence showing that defendant suffered adjustment problems at an early age. He was referred to his school's psychologist at age seven after being described by a teacher as "an overactive, impulsive child with an exaggerated curiosity about sex matters, [and the

14

teacher suspected he had] observed adult sex activity." After tests concluded that defendant was a normal boy, the psychologist concluded that defendant was being adversely affected by his environment. He suggested that the school work with the family to help defendant adjust, but nothing in the school records indicated any meetings took place. When defendant was 10 years old, he went to live with his Uncle Earl and numerous cousins. There, he was subjected to daily beatings and witnessed the severe abuse of his favorite cousin, Sheila.

When defendant was 12 years old and living in his uncle's house, he was again referred to a school psychologist, who was concerned that defendant was not performing up to expectations in school and was having hostile fantasies of a sexual nature. The psychologist recommended an investigation and that defendant be given assistance at a mental health clinic. But defendant's family never sought the assistance. Years later, defendant told a jail psychologist that between the ages of 10 and 13, he was molested by an older male when he stayed overnight at the Boys' Club. Beginning around age 12, defendant started to run away from home. Each time, the police apprehended him and took him home.

Defendant's life started to turn around after he moved back to Gary, Indiana with his mother so she could work at a job in Chicago. Defendant joined the ROTC in high school and served as the school mascot at basketball games. Defendant joined the Army before graduating high school. In the army, he became a trustworthy soldier who was described as a quick study. Erthel Bennett, defendant's sergeant, developed a father-son relationship with defendant, and testified that defendant became one of the Army's "shining stars." He rated defendant as outstanding in attitude, initiative, and leadership, and excellent in adaptability and responsibility. He believed defendant was one of the top soldiers in the unit in all categories. Defendant received a

15

commendation medal after a year of service in Korea, and was described by his battery commander as a "truly professional soldier in every sense of the word. [His] specific actions during the battery posture PS annual service practice led us being designated as an honor battery and firing at 98.4%."

Defendant's troubles with alcohol began when he joined the Navy in 1978. Jerry Hays worked with the Navy for 38 years, both on active duty and as a civilian, and reviewed defendant's personnel records. He stated that defendant graduated from boot camp on November 17, 1978, and then trained to be a boiler technician. In 1979, defendant was assigned to the cruiser U.S.S. Leahy. Between 1979 and 1981, he was cited in three Navy disciplinary matters that included minor infractions for abusing alcohol and being drunk on duty. After the Navy honorably discharged him, defendant reenlisted in March 1981. In 1985, defendant received an "other than honorable discharge."

Aaron Pratt was released from prison in June 2004, after serving a sentence for several felony convictions, including perjury. Pratt met defendant in the Navy after Pratt enlisted in 1979. According to Pratt, he and defendant were like brothers. Pratt testified that defendant was a compassionate person who loved his children, took pride in his work, and performed tasks without being asked to do so. Pratt, who drank alcohol with defendant, stated that defendant showed poor judgment when he was drunk, and his drinking got him into trouble several times in the Navy.

Marvin Rowe supervised defendant in the construction business from around 1994 or 1995 to 1997. He stated that defendant worked as a trouble-shooter who fixed whatever problems arose. Defendant showed a good attitude, although he did not always show up for work. Defendant was in prison for a couple of years off and on during the time he worked for Rowe.

16

James Esten worked for the California Department of Corrections in different capacities from 1973-1992. He reviewed defendant's prison records spanning from 1986 to 1995, and stated that defendant would not pose a threat of future dangerousness to staff, inmates, or employees if he was sentenced to life without parole.

Deborah Franklin testified that in 1974 she had a son named Daniel with defendant, when she was 16 years old and defendant was 18. She noted that defendant was their high school mascot, dressed up in costume, and took her to games. Deborah did not tell defendant she was pregnant until after he left for the Army. Her father did not want defendant to be involved in Daniel's life, and defendant did not meet Daniel until Daniel was 21 years old. Daniel testified that he loved defendant.

Defendant's other son, who was born in 1982, testified that he loved defendant and believes he is a good person. Defendant had also established a good relationship with a daughter who was born in 1981.

### 3. Defense Psychological Expert Testimony

Defense expert Dr. Rahn Minagawa, stated that he served in the Navy in Spain. He explained that shore patrol and local Spanish authorities would prepare for a surge in the number of alcohol-related incidents that would occur when the service members came ashore.

Dr. Minagawa testified that when defendant is sober, he is a highly functioning worker who provides for his family. But defendant is alcohol dependent, and when he drinks, he is unable to stop. He suffered a head injury in 1981 when he was drunk and fell asleep at the wheel of a car, causing an accident in which he was ejected from the vehicle. The injury damaged the frontal lobe of his brain and left an indentation in his skull. Dr. Minagawa opined that defendant

17

is a pedophile, and although he does not have an antisocial personality disorder, alcohol was a factor in each of his criminal offenses.

Dr. Douglas Tucker, a psychiatrist, treated sex offenders and evaluated sexually violent predators (SVPs). He specialized in treating SVPs with a history of substance abuse. He testified that childhood abuse and neglect can predispose a person to alcohol abuse and put that person at a greater risk of committing sexually violent crimes. He also stated that these same factors along with the brain damage that often occurs as a result of childhood abuse can lead to sexually inappropriate behavior.

Dr. Daniel Delis conducted defendant's neuropsychological evaluation. Defendant told him that he suffered a concussion as a child with no lingering effects, was hit with a wrench as a teenager, and was in a 1981 car accident where he lost consciousness and suffered a head injury. Dr. Delis testified that defendant's magnetic resonance imagery test showed no evidence of brain damage, that his IQ was in the average to below average range, and that he also had a number of cognitive strengths. After considering defendant's accident, his early sexual abuse by the Boys' Club director, and his possible exposure to adult sexual activity at an early age, Dr. Delis testified that these incidents may have damaged the frontal lobe of his brain significantly enough to cause him to misbehave.

### 4. *Prosecution Rebuttal Evidence*

Dr. Mark Kalish performed a psychiatric evaluation on defendant in 1986. Defendant told him that his first sexual experience occurred when he was 10 or 11 years old, with a younger cousin. He admitted to using alcohol and said that he had been drinking before he committed most of his charged offenses. Although

18

defendant admitted that he experienced pedophilic fantasies, he gave no indication that he had been abused, molested, or neglected during his childhood.

Clifford Merrill, a Solano County probation officer, prepared a probation report in April 1985 for the case arising from defendant's molestation of his daughter. Defendant had told Merrill that he had been raised by his aunt and mother, and described his childhood as happy even though he ran away three times and was placed in foster care. He said that he was not physically abused or sexually molested. He denied having unusual sexual desires or an alcohol problem, even though alcohol did play a significant role in his molestation of his daughter.

Dr. Park Dietz, a forensic psychiatrist, evaluated defendant and believed he was a sexual sadist, pedophile, and paraphiliac who would bind his victims because he had a persistent desire to see them suffer. Defendant was also an alcoholic who suffered from an antisocial personality disorder. Dr. Dietz did not believe that defendant's mild cognitive disorder would have affected his conduct.

## II. GUILT PHASE ISSUES

### A. Motion for Mistrial

Defendant contends the court erred in denying his motion for mistrial.

#### 1. Factual Background

Three weeks before opening statements, the prosecution informed defense counsel that Dr. Glenn Wagner might testify to rebut anticipated testimony by defense expert Dr. Gabaeff concerning Dr. Eisele's finding that there were no intact sperm on the slides made from the swab of Rickie's vagina. Defense counsel anticipated Dr. Gabaeff would corroborate Dr. Eisele's findings that he saw only occasional sperm heads on the slides made from the victim's vaginal swabs, and no intact sperm. Defendant claimed this indicated

19

Rickie had consensual sex with him 24-48 hours before she died, so he was not the murderer.  The trial court told the prosecution that it had an obligation to provide defense counsel with discovery on the rebuttal witness.  Approximately a week before opening statements, defense counsel interviewed Dr. Wagner, who stated that he saw an intact sperm on the same slide, and believed that intercourse took place closer in time to the victim's murder.

Defense counsel referred to Dr. Eisele's findings during his opening statement on September 2, 2004.  Thereafter, on September 7, 2004, during the prosecution's case-in-chief, but outside the jury's presence, defense counsel told the court that he had received three new photographs in computer-readable format of the same vaginal swab slide about which Dr. Eisele had earlier testified.   Dr. Eisele had taken the new photos of the swab slide that morning under different lighting conditions.

Later that same afternoon, with defendant present, but outside the jury's presence, Dr. Eisele told the court that he was aware that he and Dr. Wagner disagreed as to the time of the sexual intercourse between defendant and Rickie, but the difference did not change his original opinion, even though he did look at the slide again that morning and saw one intact sperm.  He noted that he took the new photographs in light of that finding.  The court ruled that Dr. Eisele could not testify that day so that the defense could review the new photographs and prepare its cross-examination of the witness.  The court then asked Dr. Eisele to return on the Tuesday following the weekend to testify, and it told defense counsel that it would rule on the motion for mistrial "eventually."

After the colloquy concerning the new findings, the jury reconvened, and the prosecution called an expert criminologist, Dr. Loznycky, to testify about his findings in 1986, when he examined Rickie's body shortly after her

20

murder.  He stated that bloodstains found on the victim's sweatshirt hood and collar, as well as on the collar of her tank top and the straps of her bra, were presumed to belong to her.  He also noted that her black pants and underpants smelled of urine.  Loznycky then testified that he had tested the slides from the vaginal swabs from Rickie's body for semen.  When he got a positive result, he examined the slides under a microscope and detected sperm.  He noted that DNA evidence "did not exist at that time."

The next Friday, defense counsel filed a motion for an evidentiary hearing, sanctions for discovery violation, and a mistrial.  At the hearing on the motion, counsel stated that additional controversy had developed over the new vaginal swab slide findings and a corresponding potential change in Dr. Eisele's testimony, because Dr. Loznycky's notes, written in 1986, indicated that he saw many intact sperm on the slides made from the victim's vaginal swab.  The defense stated that the prosecutor had provided the notes involving the swab results only on the day of Loznycky's testimony.

The prosecutor told the court outside the jury's presence that when he originally filed the case, he sent the defense all of the lab notes and reports involving the DNA evidence.  He did not send Dr. Loznycky's notes because he did not believe the witness "had anything to do with the DNA, based upon the report that he wrote."  The prosecutor indicated he was told originally that there was only "one plus" live sperm seen on the slides, which is the smallest number possible, and he was "in the dark" and did not know of any slide showing that there were numerous live sperm until after Sean Soriano, a criminalist and forensic biologist with the medical examiner's office, told him that he had seen Loznycky's notes indicating such evidence existed.  Soriano had testified the day before that his evidentiary slides of swab samples taken from the victim's

21

pants and crotch revealed many sperm heads. He stated that it was not unusual to see only sperm heads under a microscope even "10 hours or less" after intercourse because the tails are fragile and break off easily. Soriano never testified that he had seen Dr. Loznycky's notes, so the jury was not aware the notes existed.

Within a day of discovering that Loznycky's notes showed there was slide evidence of intact sperm, the prosecutor stated that his office advised defense counsel that they were seeking the slides, and turned them over to counsel within 24 hours. The prosecutor and defense agreed that due to the late discovery of the evidence, the prosecutor would not introduce Loznycky's notes as evidence in the trial's guilt phase.

Defense counsel told the court that he was not implying any bad faith in his motion. However, he argued, evidence of numerous intact sperm meant that Rickie had sex at the time of her death, and completely undermined the defense's second theory, that defendant's sex with Rickie was consensual.

The trial court surmised that the "existence of this separate set of swabs [sic: slides] was something of a surprise to everyone, as opposed to its disclosure being out in the open but not appreciated by everyone until the later subsequent events." The court found it remarkable that "even as we are getting into the actual performance of this trial, the facts are still being clarified on an absolutely critical level." The court did not assign "blame to anyone." It observed that "implicit with the People's argument is that circumstantially this evidence proves that George Williams was present with Rickie Blake, but more importantly, at a specific time, and that the extent to which the DNA evidence is deposited at or near the time of death, the more powerful the inference that he was the cause of death." After concluding the

22

evidence "was honestly processed on both sides to a point where, in the search for truth, apparently, we are getting some truth that is not very favorable to the defense position," the court questioned whether there was a discovery violation that could lead to sanctions against the prosecution, or simply a "human situation" in the processing of information that is not "very favorable to the defense," particularly after defense counsel had presented the intercourse timeline in his "enthusiastic opening statement" to the jury with "vim and vigor."

Defense counsel responded that his motion was not about "a statutory discovery violation." He agreed that the discovery of the additional evidence "came as a surprise to both parties." Instead, defense counsel stated that his motion for mistrial was about "fundamental fairness" and "due process" because "the prosecution told the court before trial that he was unsure whether he would call Dr. Wagner as a rebuttal witness even though he knew before trial that Dr. Wagner could testify that he found an intact sperm on a slide."

The prosecution replied, (1) that defense counsel did know Dr. Wagner's position before trial commenced, (2) that the defense had sent the photographic evidence to Dr. Eisele before trial, (3) that Dr. Eisele had said he did not see an intact sperm in the photograph, and (4) that it was not until the day before Dr. Eisele was to testify and he was in the prosecutor's office with different lighting that he looked at the slide and saw the intact sperm. The prosecutor notified defense counsel of the finding.

The court concluded that there were two issues that the new evidence created — the discovery of Loznycky's notes from 1986, and the expected testimony of Drs. Eisele and Wagner.

The court then observed that it is human nature to procrastinate, and that it is the nature of a trial that things do not "crystallize until the very last minute."

23

The court concluded that the defense reasonably relied on the expertise of Dr. Eisele and their expert, Dr. Gabaeff. It also recognized that the new evidence was potentially devastating to the defense, but found that nothing the prosecution did was subject to discovery sanctions, because the discovery of new evidence was caused not by counsel, but by "the intellectual and professional limitations of the Medical Examiner with which both sides were stuck with dealing with on this case." The court denied defendant's motion for mistrial.

Dr. Eisele then testified that his recent observation of the intact sperm did not change his opinion that it was more consistent with his conclusion that the sexual intercourse took place more than 48 hours before the victim's death. Dr. Wagner testified that he believed the sexual assault against Rickie took place within 24 hours of the slide preparation.

### 2. *Analysis*

We recognize that a court should grant a mistrial if it "is apprised of prejudice that it judges incurable by admonition or instruction." (*People v. Collins* (2010) 49 Cal.4th 175, 198 (*Collins*).) Whether an incident is prejudicial and requires a mistrial is "by its nature a speculative matter," and the "trial court is vested with considerable discretion in ruling on mistrial motions." (*Ibid.*) Thus, courts should grant a mistrial when defendant's "chances of receiving a fair trial have been irreparably damaged." (*Ibid.*)

Defendant claims that the late discovery of the slide evidence and Dr. Loznycky's notes, as well as the prosecution's delayed notice of Dr. Wagner's testimony that intercourse took place less than 24 hours from the time the vaginal swab was taken during Rickie's autopsy, amounts to prejudicial error and grounds for a mistrial because it inflicted damage to his defense position and undermined defense counsel's credibility in front of the jury. We reject the claim.

24

Although Loznycky's notes called into doubt the defense trial strategy, there was no possibility of prejudice because the jury never learned of them. Rather, the trial court determined, and counsel agreed, that the notes would not be admitted into evidence. Moreover, the court delayed Dr. Eisele's testimony about the new observation he made regarding the intact sperm to allow defendant additional time to prepare his cross-examination, and Dr. Eisele testified that his expert opinion was not altered by his observation of a single intact sperm. Dr. Eisele's recent finding may have undermined the strength of defense counsel's opening statement, but his changed observation was not due to prosecutorial misconduct. Rather, Dr. Eisele's altered opinion occurred when he saw the slide under different lighting the day before he was scheduled to testify. Dr. Wagner's testimony about the effect of seeing an intact sperm on the vaginal swab slide had been disclosed to the defense three weeks before trial, and defendant never sought additional time to respond to this testimony, suggesting any delay in notice on the prosecutor's part was not prejudicial.

Nor, for these reasons, was the disclosure of Loznycky's notes, or Dr. Eisele's changed testimony, an example of "trial by ambush" as defendant claims. Relying on federal precedent not binding on this court, defendant contends we should treat the evidence of Dr. Loznycky's notes and Dr. Eisele's changed observation as contributing to these fundamental errors at his trial. (See, e.g., *People v. Kelly* (2nd Cir. 1969) 420 F.2d 26 (*Kelly*).)

In *Kelly*, the trial court denied a defense request for a continuance to test cocaine that had been mixed with a seized batch of the drug in another, unrelated drug raid. The court granted the defense motion for new trial after concluding that the trial court should have granted the continuance due to the similarity between the two samples of cocaine. (*Kelly*, *supra*, 420 F.2d at p. 29.) In *U.S. v. Camargo-Vergara* (11th Cir. 1995) 57 F.3d 993 (*Camargo-Vergara*)), on which defendant also relies, the trial court denied the defendant's

25

mistrial motion after a federal Drug Enforcement Administration agent testified to a statement defendant made to the agent that the prosecution had failed to disclose to the defense. The statement was inconsistent with the defense theory and opening statement that defendant wanted nothing to do with drugs. (*Id.* at p. 998.) The court of appeals reversed the judgment after concluding the defendant had an inadequate opportunity to prepare a defense trial strategy, and the undisclosed evidence substantially influenced the jury. (*Id.* at pp. 998-999.)

As the People observe, defendant's case is materially distinguishable from *Kelly* and *Camargo-Vergara.* Here, defendant *was* allowed a continuance before Dr. Eisele's testimony, and Dr. Eisele testified that his observation of the single intact sperm on the slide the day he was to testify did not alter his expert opinion. Additionally, Dr. Loznycky's notes regarding his observations about an intact sperm on the slide he viewed were not introduced into evidence, and therefore had no impact on defendant's trial.

Defendant's additional reliance on several federal cases in which undisclosed evidence was either intentionally or erroneously admitted by the prosecution during trial without notice to the defendant, or was used to impeach the defendant or a defense witness on cross-examination, does not assist his claim. In each case, the evidence the prosecution did not disclose incriminated the defendant and effectively undermined his defense. (See, e.g., *U.S. v. Thomas* (2nd Cir. 2001) 239 F.3d 163, 168 [defendant prejudiced when undisclosed statements in prior administrative hearing were used to impeach his trial testimony]; *U.S. v. Lanoue* (1st Cir. 1995) 71 F.3d 966, 976-978 [defendant's undisclosed statement used to impeach defense witness]; *U.S. v. Alvarez* (1st Cir. 1993) 987 F.2d 77, 84-85 [conviction reversed for failure to disclose defendant's incriminating statement to customs agent admitted during trial]; *U.S. v. Padrone* (2nd Cir. 1969) 406 F.2d 560, 561 [new trial ordered where recorded statement by defendant not disclosed but used to impeach

26

defendant's testimony].)  We conclude the trial court did not abuse its considerable discretion in denying defendant's mistrial motion.  (*Collins*, *supra*, 49 Cal.4th at p. 198.)

### B.  Alleged Prosecutorial Misconduct

Defendant claims the prosecutor engaged in prejudicial misconduct by denigrating the defense and suggesting that defense counsel concocted the defense he presented to the jury.  We disagree.

During defendant's tape-recorded police interview on February 11, 2003, after defendant was arrested for Rickie's murder, defendant claimed that he never knew a girl named Rickie Blake.  When shown photographs of her, defendant stated:  "I'm sure. I never seen her before in my life."  Defendant also claimed he did not know how his sperm came to be discovered on the vaginal swab taken from Rickie.  (Defendant later asserted the sex with Rickie was consensual.)

The prosecutor used defendant's contradictory statements in his police interview to support the People's case at various points during trial.  His opening statement ended with the following summary:  "This man raped fourteen-year-old Rickie Blake.  And this man in the courtroom with us today is the man who killed fourteen-year-old Rickie Blake, and now has the nerve to say it was love, consensual sex, and George Bell did it.  But actually, he didn't say that.  He said, 'I didn't do anything.'  That is his defense.  He lied the first time when he spoke to the officers.  Don't let it happen a second time."  Defendant did not object.

During his case-in-chief, again without defense objection, the prosecutor pointed out the difference between what defendant stated in the interview and his defense at trial, that he and Rickie had engaged in a consensual sexual relationship.  The prosecutor began his closing argument by initially observing that the jury had been presented with three theories:  one, that defendant raped

and murdered Rickie, and committed sexual offenses against other victims; two, that he committed other offenses but had nothing to do with Rickie's murder; and, three, that he committed sexual assaults on other victims, but had consensual sex with Rickie, and that George Bell killed Rickie. Later during closing argument, and without defense objection, the prosecutor noted that the jury had heard two incompatible theories. The first was defendant's statement that he never met Rickie. The prosecutor added, "That was his defense. And it stinks. And it's a lie. And it's wrong. And it's his defense. That is the defense he came up with. And we know it is wrong because the DNA tells us it's wrong." The prosecutor then commented on defendant's second defense theory. He told the jury that in his opening statement, defense counsel claimed that defendant had consensual sex with Rickie and that George Bell killed her. During the prosecutor's closing statement, he told the jury: "What can we find, because that first one he wants to use doesn't work. We got to scramble to find something else. And that's what we heard about from the defense, the second best defense. Jesus, Williams, why didn't you come up with the best one the first time. I thought I did. But he didn't."

"MR. WADLER (defense counsel): I would object that that is improper argument, your honor.

"THE COURT: Overruled.

"MR DUSEK (prosecutor): He told you what his defense is, and his defense falls flat on his face."

The prosecutor then told the jury that the case "has been proven beyond a reasonable doubt, and perhaps we even have gone further up the scale. His first defense fails. His second defense, stand-by defense, cannot be supported by the evidence. He's guilty of all charges."

28

Defendant initially claims that the prosecutor committed misconduct each time he referred skeptically to defendant's defense, or pointed out the discrepancies in defendant's police interview and subsequent statements during trial.

It is error for a prosecutor to argue that defense counsel knew his client was guilty but proceeded with a sham defense. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1337-1338 [improper for prosecutor to assert defense "counsel presented a sham defense"]; see *People v. Hill* (1998) 17 Cal.4th 800, 824-835 [finding prosecutorial misconduct when prosecutor misstated or mischaracterized evidence and attacked defense counsel's integrity]; *People v. Bain* (1971) 5 Cal.3d 839, 847 [prosecutor's unsupported implication that defense counsel fabricated defense is misconduct].) However, defendant's failure to raise an objection to a prosecutor's remarks and to request a curative instruction forfeits the objection. (*People v. Watkins* (2012) 55 Cal.4th 999, 1032 [defendant forfeits prosecutorial misconduct claims by failing to object and request an admonition].) Even if defendant had objected to the statements, we would find no error. The prosecutor's comments did not cast aspersions on defense counsel or imply that he was dishonest. Indeed, the prosecutor's comments did not even reference defense counsel, but instead focused on defendant's changing story. Thus, the comments were meant "to vigorously challenge the validity of [the] defense," given the clearly contradictory evidence and unsupported facts the defense presented. (*Seumanu*, *supra,* 61 Cal.4th at p. 1337.)

As to the closing argument comments in which the prosecutor claimed that defendant lied and knowingly put on contradictory evidence — and to which defendant did object — we also find no error. The gist of the prosecutor's comments in context, like the entire closing argument, referred to the reasonable conclusion, based on the evidence, that defendant was the

murderer. (*People v. Edwards* (2013) 57 Cal.4th 658, 740-742 [prosecutorial assertions of defendant's guilt based on the evidence do not amount to misconduct].)

### C. Third Party Culpability Evidence

#### 1. *Proceedings Below*

The defense made a pretrial motion to present evidence in support of its third party culpability evidence theory that George Bell killed Rickie. The evidence was an offer of proof that Bell lied about his whereabouts on the night Rickie disappeared, choked his girlfriend in a manner similar to the way Rickie had been choked to death, made statements about the manner in which Rickie's body was found, and made comments that demonstrated a consciousness of guilt. After arguments on both sides, the court allowed defendant to present his third party culpability defense, and required the prosecution to object to any evidence it believed was inadmissible.

#### 2. *Exclusion of Hearsay Statement*

Defense counsel then made a motion in limine to admit FBI Agent Kelly's testimony regarding a hearsay statement Rickie's mother made to him — that Bell called her after midnight over 10 years after Rickie's murder to tell her, "I can't live this way anymore. I can't hurt you anymore. I need to talk to Olias" (the San Diego detective originally assigned to the murder investigation). At a hearing on the evidence's admissibility, the court asked defense counsel whether *Green v. Georgia* (1979) 442 U.S. 95 (*Green*) supported admitting the hearsay statement. In *Green*, the high court held that a violation of a defendant's due process rights occurs at a capital case's penalty trial when the court excludes hearsay testimony that is "highly relevant" to a crucial penalty phase issue, and "substantial reasons exist[] to assume its reliability." (*Id.* at p. 97.)

30

The court held a hearing outside the jury's presence on the admissibility of the hearsay statement in light of *Green.* Defense counsel asserted that the evidence was reliable and critical to a determination of defendant's guilt because Kelly's contemporaneous notes of the conversation were available and potentially exculpatory. The prosecution noted that defendant had other means of admitting the evidence, including calling Bell as a witness, which he later used. The court concluded that the statement was inadmissible hearsay, and not reliable, critical or necessary.

Although *Green* held that due process is implicated when a trial court excludes "highly relevant" and reliable mitigating evidence on hearsay grounds (*Green*, *supra*, 442 U.S. at p. 97), that court addressed the hearsay question at the penalty, not guilt, phase, and held that its exclusion implicates due process concerns only if the evidence bears " 'special indicia of reliability.' " (*People v. Eubanks* (2011) 53 Cal.4th 110, 150, quoting *People v. Weaver* (2001) 26 Cal.4th 876, 980-981.) Our ordinary rules of evidence gave rise to no constitutional violation at the guilt phase of the trial when the court excluded inadmissible hearsay evidence of alleged third party culpability. (*People v. Cudjo* (1993) 6 Cal.4th 585, 610-611.)

In any event, the jury heard about Bell's phone call to Mrs. Blake when Bell testified. For this reason, defendant suffered no prejudice from the ruling. When the People called Bell as a prosecution rebuttal witness, he acknowledged speaking to his ex-wife Gloria, the police, and others about Rickie's death. He admitted telling Mrs. Blake that he could not "live like this anymore. I can't hurt you anymore." He also said he asked her how to reach Detective Olias because his conversation with Richardson had raised issues for him about the murder.

Additionally, during defendant's closing argument, counsel addressed Bell's phone call to Mrs. Blake and highlighted the same statements characterizing the conversation as evidence of Bell's consciousness of "crushing guilt." Thus the jury was aware of Bell's statements, and that it could consider them in their guilt phase deliberations.

### 3. Objections to Cross-examination of George Bell

In a related argument, defendant claims the court "exacerbated the prejudice from failing to admit Kelly's testimony about Bell's highly incriminating statements to Mrs. Blake" when it sustained three prosecution objections to defense counsel's cross-examination of Bell's rebuttal testimony. Defendant complains that in sustaining the objections, the court violated his Sixth Amendment right to confront the witness. We disagree.

The first sustained objection followed defense counsel's questions about Bell's phone call to Mrs. Blake in August 1996. The prosecution objected after counsel asked Bell to refresh his recollection with a prior statement he made to FBI Agent Kelly in which he told Mrs. Blake that he wanted to talk to Detective Olias during his conversation with her:

"MR. REICHERT (defense counsel): Sir, isn't it true that you did call Mrs. Blake up August of 1996 at 12:20 a.m., late night/early morning?

"MR. BELL: Well, [FBI Agent Kelly's report about the phone call] proved to me that I did.

"MR. REICHERT: You did do it, didn't you, sir?

"MR. BELL: Yes.

"MR. REICHERT: And when you called up Mrs. Blake you told her, 'I can't live like this anymore. I can't hurt you anymore,' didn't you?

"MR. BELL: Yes. I don't remember it, but I did eventually, yes.

"MR. REICHERT: Sound like something you might have said?

"Mr. BELL: No.

"MR. REICHERT: Okay. Did you tell her that you wanted to talk to Olias after you said, 'I can't live like this anymore, I can't hurt you anymore, I need to talk to Olias?' "

The prosecutor objected to the testimony on the ground that it "misstates the evidence." The People expressed concern that because Bell had earlier stated that he asked Mrs. Blake how he could get hold of Olias before he mentioned that he could not "live like this anymore," the jury could have interpreted the question as implying that Bell told Mrs. Blake that he wanted to talk to Olias twice, rather than once. The court sustained the objection.

Defense counsel then questioned Bell on the fact that he would only talk about Rickie's death when he was drunk or high on drugs.

"MR. REICHERT: Isn't it true that when you would get liquored up or get high on drugs, you'd start talking about this, about what happened with Rickie Blake, isn't it?

"MR. BELL: Only when I was by myself, not jibber jabber with everybody, no. Just mental things, kicking back, drink a couple beers, think and praying, you know.

"MR. REICHERT: And then you'd decide to call Mrs. Blake at 12:30 at night 10 years after this accident?"

The prosecution objected to the last question as "asked and answered." The court sustained the objection, apparently because defense counsel had already asked Bell about his phone call to Mrs. Blake.

The prosecution's third objection was made after defense counsel asked Bell, "You would because of alcohol and drugs, you would do or say things and then later not remember them?" The prosecution's sustained objection was that

33

the question called "for speculation" because earlier Bell had said he could not remember the phone call to Mrs. Blake without having his memory refreshed by looking at Agent Kelly's report.

Defendant now claims that the trial court erred in sustaining all three objections because they deprived defendant of his ability to clarify Bell's testimony. The sustained objections also undermined defendant's "blackout line of inquiry" and ability to establish reasonable doubt that defendant killed Rickie.

We conclude that the trial court did not reversibly err by sustaining the objections. Although the Sixth Amendment to the federal Constitution provides a defendant with the right to engage in appropriate cross-examination of witnesses, the trial court retains the ability to impose reasonable limits on counsel's inquiry if it is repetitive or marginally relevant. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679.) Additionally, the court's "limitation on cross-examination does not violate the confrontation clause unless a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted." (*People v. Quartermain* (1997) 16 Cal.4th 600, 624; *People v. Linton* (2013) 56 Cal.4th 1146, 1188 (*Linton*) [court " 'retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance' "].)

Here, the trial court properly sustained the first objection because defense counsel's question misstated Bell's testimony, and erroneously assumed that Bell told Mrs. Blake twice that he wanted to talk to Detective Olias. In any event, the evidence of what Bell said to Mrs. Blake was presented, and counsel was able to use the statement to support its theory that Bell, not defendant, was Rickie's murderer.

34

The court also did not err when it sustained the prosecutor's objection to defense counsel's question about Bell's call to Mrs. Blake "10 years" after the murder. Counsel had already questioned Bell about the call to Mrs. Blake, so the "asked and answered" objection was properly sustained.

Further, even if the court's ruling on the prosecutor's third objection to counsel's question regarding the effect of Bell's alcohol use on his ability to remember things was erroneous, any error was harmless. The omitted testimony would have highlighted Bell's blackouts when he was abusing alcohol or drugs; the defense theory, by contrast, depended on Bell's remembering his murder of Rickie, and the "crushing guilt" he felt as a result of his recollection.

Finally, there is no reasonable probability the jury would have " 'received a significantly different impression' " of Bell's credibility had the excluded cross-examination been permitted. (*Linton*, *supra*, 56 Cal.4th at p. 1188, quoting *People v. Frye* (1998) 18 Cal.4th 894, 946.)

### 4. *Refusal to Give Requested Pinpoint Instruction*

The trial court gave the jury numerous instructions, including CALJIC No. 2.03 (Consciousness of Guilt — Falsehood) and CALJIC No. 2.90 (Presumption of Innocence — Reasonable Doubt — Burden of Proof). Defendant asserts that the court erred when it refused to give his specific instructions, which were variations on the instructions given. Although we have determined that a trial court may be required in appropriate circumstances " 'to give a requested jury instruction that pinpoints a defense theory of the case,' " we have also held that the court " 'need not give a pinpoint instruction if it is argumentative [citation], merely duplicates other instructions [citation], or is not supported by substantial evidence [citation].' " (*People v. Hartsch* (2010) 49 Cal.4th 472, 500 (*Hartsch*).)

35

Initially, defendant requested the court give his special instruction regarding Bell's false alibi and failure to deny he killed Rickie when he was given a chance to do so. He asked the court to give a modified version of CALJIC 2.03 (Consciousness of Guilt-Falsehood) that would have told the jury that if it found Bell "made willfully false or deliberately misleading statements concerning the crime for which the defendant, George Williams is now being charged, you may consider those statements as raising a reasonable doubt as to the guilt of the defendant in that they tend to prove a consciousness of guilt on the part of George Cardenas Bell." The court instead gave the standard consciousness of guilt instruction of CALJIC No. 2.03.[2]

The court also refused to give a modified version of CALJIC 2.71.5 (Adoptive Admission – Silence, False or Evasive Reply to Accusation), that if it "should find from the evidence that there was an occasion when George Cardenas Bell, under conditions which reasonably afforded him an opportunity to reply, failed to make a denial in the face of an accusation expressed directly to him, charging him with the crime for which the defendant is now on trial, or tending to connect him with its commission, and that he heard the accusation and understood its nature, then the circumstance of his silence on that occasion may be considered against him as indicating an admission that the accusation was true. [¶] If you find that this circumstance occurred you may view that evidence as raising a reasonable doubt as to the guilt of the defendant, George Williams. [¶] However, its weight and significance, if any, are matters for your determination." The court

---

[2]     CALJIC No. 2.03 as given stated: "If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider that statement as a circumstance tending to prove a consciousness of guilt. However, that conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide."

did, however give a modified form of defendant's requested instruction when it added the following language to CALJIC 2.90's reasonable doubt instruction:[3] "You have heard evidence that George Cardenas Bell may have committed the crime or crimes for which the defendant, George Williams, has been charged. The burden is on the People to prove beyond a reasonable doubt that the defendant is the person who committed the crimes with which he is charged. If after considering the evidence regarding George Cardenas Bell and all of the other evidence in this case, you have a reasonable doubt whether the defendant was the person who committed the crime or crimes, you must give the defendant the benefit of that doubt and find him not guilty."

The court rejected as argumentative and duplicative of the instructions given defendant's additional proposed instructions about the effect of Bell's "willfully false statements" that he was with his girlfriend Tink Armstrong on the night of Rickie's death (Armstrong was attending a funeral in Los Angeles on that night) and that Bell's alleged suppression of evidence, if found, could be considered as raising a reasonable doubt of defendant's guilt. For the same reasons, the court denied defendant's request to instruct the jury that Bell's silence and failure to deny the accusation that he was responsible for Rickie's murder when given an opportunity to reply to the accusation, assuming it was understood, was an admission "that the accusation was true." Defendant

---

[3]     CALJIC No. 2.90 as given instructed the jury that: "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt.  [¶]  Reasonable doubt is defined as follows:  It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge."

contends that the court's failure to give his requested instructions unfairly thwarted his defense theory, and "tipped the scales against" him because even if the jury concluded that Bell presented false testimony, the jury "would not know what weight it could give to that testimony."

We find no error in the trial court's refusal to give any of defendant's requested instructions on the grounds that they were argumentative and duplicative of the CALJIC instructions given. The CALJIC instructions the jury did hear, as well as the court's modified version of CALJIC 2.90 on reasonable doubt and consideration of Bell's involvement in the crime, "provided ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof." (*Hartsch*, *supra*, 49 Cal.4th at p. 504.) The instructions sufficiently highlighted the fact that the jury could weigh the effect of Bell's lie about Armstrong and his alibi, as well as his silence when confronted with the accusation that he killed Rickie, in its determination of whether there was reasonable doubt that defendant committed Rickie's murder. (*Ibid.*)

### 5. *Alleged Cumulative Error or Prejudice*

Defendant asserts that even if his claims involving Bell were not prejudicial individually, they combined to create a prejudicial effect and require reversal. We have found no prejudicial error, and further conclude defendant's asserted errors were not prejudicial when considered cumulatively.

Defendant relies on *DePetris v. Kuykendall* (9th Cir. 2001) 239 F.3d 1057, 1062-1065, in which the court allowed a defendant charged with murdering her husband to rely on an imperfect self-defense claim, but barred her from presenting evidence of her husband's diary which documented his

38

violence towards her.  The Ninth Circuit held that the diary's exclusion, as well as excluding defendant's testimony about its contents, deprived defendant of her constitutional right to present a defense.  (*Ibid.*)

We conclude no such deprivation is present here.  The jury heard the evidence about Bell's phone call and his statements to Mrs. Blake, as well as his false alibi and failure to deny his part in the murder.  The defense also argued that Bell's statements and failure to deny accusations gave rise to a reasonable doubt that defendant killed Rickie.

### D.  Evidence of Uncharged Sexual Misconduct

Defendant asserts the trial court committed error and violated his due process rights when it failed to exclude evidence of his past uncharged incidents of sexual misconduct — defendant's 1984 molestation of his daughter I., and the rape and sodomy of Velma W. and her daughter Alicia C. — under Evidence Code sections 352 and 1108, because the evidence was used to show that he raped and killed Rickie.  He contends that the other crimes evidence allowed the jury to infer that defendant committed the rape and murder without regard to the timing of the offense or his alleged consensual sexual interaction with the victim before her murder.  Defendant relies on cases from states that have found other crimes evidence is a violation of their state constitutions, including Iowa, which held that the admission of other sexual assaults the defendant committed violated the defendant's due process rights.  (*State v. Cox* (Iowa 2010) 781 N.W.2d 757 [finding state statute that allowed admission of other sexual assaults violated state due process clause].)  Additionally, defendant asks the court either to distinguish on its facts or reconsider its holding in *People v. Falsetta* (1999) 21 Cal.4th 903, 916-917 (*Falsetta*).  *Falsetta* held that admission of other sexual

39

offenses under Evidence Code section 1108 is constitutional. (*Ibid*.) We disagree with defendant and decline to distinguish or reconsider *Falsetta.*

*Falsetta* recognized that even if the rule against propensity evidence in sex offense cases is rooted in fundamental due process principles, we perceive no unfairness in applying Evidence Code section 1108's limited exception to the historical rule "in light of the substantial protections afforded to defendants in all cases to which section 1108 applies." (*Falsetta*, *supra*, 21 Cal.4th at p. 915.) More recently, we have recognized that "[w]hen a defendant is accused of a sex offense, Evidence Code section 1108 permits the court to admit evidence of the defendant's commission of other sex offenses, thus allowing the jury to learn of the defendant's possible disposition to commit sex crimes. [Citation.] The court has discretion under Evidence Code section 352 to exclude the evidence if it is unduly prejudicial. [Citation.] The evidence is presumed admissible and is to be excluded only if its prejudicial effect substantially outweighs its probative value in showing the defendant's disposition to commit the charged sex offense or other relevant matters." (*People v. Cordova* (2015) 62 Cal.4th 104, 132.)

We find that the trial court did not abuse its discretion in admitting evidence of defendant's uncharged sex offenses here to show he was disposed to committing violent sex crimes. The trial court reasonably found that both uncharged sexual assault crimes bore similarities to Rickie's sexual assault and murder. The uncharged crimes were also not remote in time to the charged conduct — Velma W. and her daughter were raped less than one week after Rickie's rape and murder. (See *People v. Jones* (2012) 54 Cal.4th 1, 49-51 [allowing uncharged sexual misconduct was not inflammatory, too remote in time, or otherwise a violation of defendant's due process rights].) Defendant's assault on Alicia C. involved a prepubescent child; Rickie was also young. There was also evidence that defendant used or attempted to use alcohol during

40

each offense. Additionally, the uncharged offenses were especially probative and no more inflammatory, and would not have evoked a stronger emotional reaction, than defendant's alleged crimes against Rickie. (See *People v. Loy* (2011) 52 Cal.4th 46, 62.) For these reasons, the trial court acted well within its discretion in concluding the uncharged crimes had significant probative value and were not unduly prejudicial. (*Id.* at pp. 62-63.)

## III. PENALTY PHASE ISSUES

### A. Failure to Allow Videotaped Interviews of Defense Witnesses

Before the penalty phase began, defendant moved the court to allow the jury to hear defendant's unsworn videotape-recorded interviews of unavailable witnesses Sophie Williams (no relation) and Annie Whitfield. Defense counsel had procured the interviews after traveling to Gary, Indiana, defendant's birthplace, where both witnesses still resided, and he provided the prosecution with the witnesses' names. After initially granting defendant's request, the court changed its mind and denied it. Defendant asserts that in refusing to allow the evidence, the court violated his due process right to a fair trial. We disagree.

#### 1. Background

According to defendant, Sophie Williams spoke on the videotape about defendant's positive behavior after he returned to Indiana following his earlier incarceration in California. Her husband taught defendant carpentry, and he was an able student who built a porch onto their home and later helped Sophie around the house after her husband died.

Annie Whitfield's recorded statement concerned defendant's behavior as a happy child when he was with her, but indicated that his father was an alcoholic and his mother Lelar drank heavily, was cruel, and physically abused defendant in front of her. Annie Whitfield also stated she had heard that

41

defendant was molested as a boy by one of the men living in his house. Defendant claims that Annie Whitfield's testimony about his mother's physical abuse and drinking, as well as the molestation and a social worker's subsequent apparent removal of him from his home, explains defendant's alcohol dependency that began in the Navy. It also contradicted testimony from family members, including Lelar and her sister, who stated that Lelar did not drink, or drank only occasionally.

The trial court initially overruled the prosecution's objection to the evidence on hearsay grounds after concluding the evidence was admissible under section 190.3, factor (k) as mitigating evidence. After the court's ruling, the prosecution gave the judge handwritten objections to portions of the recordings' transcripts on grounds other than hearsay. Nothing more was said about the videotaped recordings until the court reconsidered its ruling several days later before defense counsel's opening statement to the jury. The court stated: "I am looking at some residual due process exception to the hearsay rules, which requires some reliability. And upon reflection, it seemed to me that . . . we get all caught up [in] the right to confrontation and the right to cross-examination; and the thing about cross-examination, [it] is that period of time in which a lawyer gets to destroy another['s] witness through impeachment. But it is also the time when the reliability of the evidence is demonstrated . . . ."

The trial court expressed concern that the Sophie Williams videotaped recording was inherently unreliable, because it indicated she lacked personal knowledge about defendant, and it failed to explain when she knew defendant and the extent of her relationship with him. The court had similar concerns with the Annie Whitfield videotaped recording, because many of her

42

statements about defendant's childhood were not based on firsthand knowledge, and she had taken care of defendant for only a short time. The court was also concerned about both witnesses' unavailability for cross-examination.

### 2. Discussion

We conclude there was no abuse of discretion in excluding the videotaped recordings.

A defendant has no constitutional right to present evidence that contains hearsay and is lacking in foundation or other indicia of reliability. In *People v. Morrison*, defense counsel sought to introduce evidence that authorities found a large amount of cash at the home where a home invasion and murder occurred, which suggested that the victims were somehow involved in drug trafficking activity. (*People v. Morrison* (2004) 34 Cal.4th. 698, 720-723.) The trial court sustained the prosecution's hearsay and relevance objections to the evidence. This court held that although highly relevant and substantially reliable hearsay evidence may be admissible, exclusion of the drug trafficking evidence on hearsay and relevance grounds did not violate the defendant's due process constitutional rights. In so holding, we observed that "the United States Supreme Court has never suggested that states are without power to formulate and apply reasonable foundational requirements for the admission of evidence. [Citations.] Foundational prerequisites are fundamental, of course, to any exception to the hearsay rule. [Citation.] Application of these ordinary rules of evidence to the alleged drug-related components of the proffered testimony did not impermissibly infringe on defendant's right to present a defense." (*Id.* at pp. 724-725; see *People v. Stanley* (1995) 10 Cal.4th 764, 839 [videotape recordings that provide no indicia of reliability properly excluded].)

43

Much of what Annie Whitfield claimed to remember was from when defendant was a small boy, and included recollections based on both her own experience as well as anecdotal and third party hearsay recounts of defendant's childhood. Sophie Williams failed to identify the time frame in which she knew defendant, and she admitted that her recollections were based on decades-old information or on stories recounted by her husband. Given these factors and the lack of cross-examination available to the prosecution at trial, the trial court acted well within its discretion in finding the evidence unreliable and therefore inadmissible.

Defendant argues that the prosecution had no objections to portions of the videotapes when it requested redaction of certain statements. However, this acquiescence occurred only after the court overruled the prosecution's initial objection to the evidence on multiple hearsay grounds. The prosecutor's additional objections were made in light of the court's initial ruling that the videotaped interviews were admissible.

### B. Objection to Dr. Minagawa's Testimony

Dr. Rahn Minagawa testified that defendant was alcohol dependent. He provided facts about alcohol dependence, noted that defendant's mother and father were alcoholics, and opined that the physical abuse defendant suffered at the hands of his mother was attributable to her alcoholism. When defense counsel asked Dr. Minagawa where he obtained the information that defendant's mother was an alcoholic, the expert stated, "from interviews with family members, and also from the impression of the foster mother [Annie Whitfield] who was taking care of [defendant] when he was —" The prosecutor interrupted with a hearsay objection that the court sustained. The court later made it clear that it did not sustain the objection on Evidence Code

44

section 352 grounds. Dr. Minagawa continued, without further objection, by noting that family alcoholism was one of the most significant risk factors for alcohol dependence.

Defendant claims that the court erred in sustaining the prosecution's objection. He relies on Evidence Code section 802 to support his contention. That section provides, "[A] witness testifying in the form of an opinion may state on direct examination the reasons for his opinion and the matter (including, in the case of an expert, his special knowledge, skill, experience, training, and education) upon which it is based . . . ." (*Ibid.*) Defendant contends that the expert properly relied on information from Annie Whitfield's excluded videotaped statement as well as the statements of other family members, and thus the objection should have been overruled. Defendant also contends that by sustaining the objection, the court undermined the expert's opinion that there was a genetic basis for defendant's alcohol dependence and abuse — an important mitigating theme in defendant's case.

We recently held that the hearsay rule of Evidence Code section 802 does not allow prosecution experts to rely on case-specific hearsay to support their trial testimony. (*People v. Sanchez* (2016) 63 Cal.4th 665, 670-671 (*Sanchez*).) In *Sanchez*, the defendant objected to a gang expert's description of his past contacts with police because he based it on "case-specific hearsay" that did not fall under a statutory hearsay exception. (*Sanchez*, *supra*, 63 Cal.4th at p. 670.) We concluded the expert's reliance on statements concerning the defendant's past gang membership was offered as testimonial hearsay for its truth and was therefore not allowed. (*Id.* at pp. 675-676.) Here, Dr. Minagawa relied in part on the testimonial hearsay of family members and defendant's foster mother to support his testimony about the effect of defendant's mother's alcoholism on his

45

development.  As we explained in *Sanchez*, "an expert has traditionally been precluded from relating *case-specific* facts about which the expert has no independent knowledge."  (*Id.* at p. 676.)  Thus, the court properly sustained the prosecutor's objection.

*Sanchez* also observed that an expert is allowed to "testify about more generalized information to help jurors understand the significance of those case-specific facts" and is permitted "to give an opinion about what those facts may mean."  (*Sanchez, supra,* 63 Cal.4th at p. 676.)  Here, Dr. Minagawa did just that.  After the court sustained the prosecutor's objection to the hearsay testimony, he continued to give his expert opinion that he diagnosed defendant as alcohol dependent, and that he believed this dependence derived from a history of parental alcoholism.  The jury also heard testimony from defense expert Dr. Tucker and prosecution expert Dr. Deitz regarding defendant's childhood exposure to alcoholism and his alcohol dependence.  The jury was therefore well aware that defendant's childhood exposure to alcoholic behavior likely contributed to or influenced his alcohol dependence.  We conclude there is no reasonable possibility a different penalty verdict would have resulted had the trial court not sustained the prosecutor's objection.  (*Chapman v. California* (1967) 386 U.S. 18, 23; *People v. Brown* (1988) 46 Cal.3d 432, 448.)

## C.  Failure to Order Conditional Examination of Witnesses

After the court sustained the prosecution's objection to Dr. Minagawa's reliance on the videotaped testimony of Sophie Williams and Annie Whitfield, and the expert completed his testimony, defendant filed a motion to recess the penalty phase so the court and counsel could travel to Gary, Indiana to conduct conditional

46

examinations of the two defense witnesses.[4] Defendant told the court the witnesses' testimonies was "absolutely necessary" in light of the court's sustaining of the prosecution's hearsay objection to the expert's reliance on Annie Whitfield's testimony. The prosecutor objected to the request as untimely and unreliable. Defendant argued that the witnesses' age and ill health rendered their appearance in San Diego impossible, and he should be allowed to produce any relevant mitigating evidence under high court precedent. (See *Lockett v. Ohio* (1998) 438 U.S. 586, 604 [capital defendant generally must be allowed to present any relevant mitigating evidence of his character or record or circumstances of the offense].) The trial court found the evidence limited in scope, cumulative, unreliable, and "so minuscule as to not warrant a conditional exam."

Section 1335, subdivision (a) allows a capital defendant to have a witness conditionally examined provided the request meets the chapter's provisions. Section 1336, subdivision (a) provides that a trial court may order a conditional exam of a "material witness for the defendant" if that witness "is so sick or infirm as to afford reasonable grounds for apprehension that he or she will be unable to attend the trial, or is a person 65 years of age or older." The statutory language is clear; the court has broad discretion to either grant or deny a capital defendant's request for a conditional examination of a witness. (*People v. Jurado* (2006) 38 Cal.4th 72, 114 [statutory scheme vests trial court with broad discretion to determine whether conditional examination of witness is warranted].)

We conclude no abuse of discretion occurred in the court's failure to grant the conditional examinations defendant requested. Here, both witnesses were over 65 years of age, and thus met section 1336, subdivision (a)'s age

---

[4] We note that if the court orders a conditional examination, it can occur in front of a designated magistrate and does not require a trial judge to travel. (§ 1339.)

47

requirement for a conditional exam.  But the jury heard substantially similar testimony from family members and other witnesses about both defendant's abusive upbringing and his capacity to act compassionately.  Additionally, as discussed, because the jury heard similar testimony regarding the possibly material evidence of defendant's mother's alleged alcohol addiction through Dr. Minagawa's and other properly admitted experts' testimony, no reasonable possibility exists that the absence of Annie Whitfield affected the verdict. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 961.)

### D.  Defense Instruction on Race

Defendant asserts that the court erroneously rejected his proposed instruction to disregard his and the victim's different races and to require jurors to sign a certificate stating that they did not consider race in their verdict.  The requested instruction was derived from the Federal Death Penalty Act of 1994 (18 U.S.C. § 3593(f)), and it asks the jury not to "consider the race, color, religious beliefs, national origin, sex or sexual orientation of the defendant or any victims" and to sign a certificate that the above considerations did not enter into their sentencing decision.  The prosecution opposed the proposed instruction, citing *People v. Smith* (2003) 30 Cal.4th 581, 639 (*Smith*). Defendant relies in part on George Bell's testimony about a comment he made when he was informed defendant was a suspect in Rickie's murder:  "No way a black dude in our neighborhood."

In *Smith*, the defendant, a Black man, was convicted of kidnapping, raping, and murdering a female Japanese exchange student.  We upheld the trial court's refusal to give the same instruction that defendant requests here. Initially, we observed that the instruction is not constitutionally required. (*Smith, supra,* 30 Cal.4th at p. 639, citing 18 U.S.C. § 3593 (f).)  We then noted,

48

"Obviously the jury may not consider the defendant's or victim's race in deciding whether to impose the death penalty. . . . But the court need not interject the issue of race itself and then tell the jury to disregard it, at least absent some indication the jury might improperly consider race." (*Smith*, *supra*, 30 Cal.4th at p. 639.)

Although Bell's comment suggests he held racist views, there is no indication that his brief and isolated comment improperly factored into the jury's deliberations, nor is it an example of how racial disparities persist in death penalty jurisprudence. (See *Turner v. Murray* (1986) 476 U.S. 28, 35 [recognizing opportunity for racial bias to "operate but remain undetected" in capital sentencing].) The court also instructed the jury in the language of CALJIC No. 8.84.1 that "it must neither be influenced by bias nor prejudice against the defendant." We are thus satisfied that the trial court did not err when it refused to give defendant's requested instruction.

### E. Instruction on Meaning of Life without Possibility of Parole

Defendant claims that the court erred when it rejected defendant's request to give the jury proposed defense instruction No. 3, which would have told the jury that a death sentence meant he would be executed, and that a sentence of life without the possibility of parole meant that he would never be paroled. We find no error. A defendant's due process rights are not violated when a trial court refuses to instruct that a sentence of life without the possibility means the defendant will never leave prison. (See, e.g., *People v. Moon* (2005) 37 Cal.4th 1, 13 [instruction defining the meaning of life without possibility of parole not constitutionally required].)

In a related argument, defendant relies on *Caldwell v. Mississippi* (1985) 472 U.S. 320, 330, to contend that the court's failure to give his proffered

instruction was exacerbated when it sustained the prosecution's improper argument objection to defense counsel's statement that a reviewing court would not scrutinize any decision the jury made as to punishment, because the jury was "not only sixteen gods, you are sixteen supreme courts, you are sixteen appellate courts, you are sixteen trial courts. [And] it is difficult, if not impossible, for [reviewing courts] to look down on pieces of paper that have been compiled over the last two months and say, well, this jury got it wrong. They won't do that." We rejected a similar argument in *Smith*, where the court sustained the prosecutor's objection to defense counsel's argument "that defendant would never have a parole hearing." (*Smith*, *supra*, 30 Cal.4th at p. 636.) We find no error here as well, in light of the fact that defendant's comment that a reviewing court would find it "difficult if not impossible" to effectively review the jury's sentencing decision was inaccurate, and that counsel made it clear that a sentence of life without parole would mean defendant would not be paroled and would die in prison. (*Ibid.*)

### F. Alleged Cumulative Penalty Phase Error

Defendant claims that even if we find his asserted errors are not individually prejudicial, we must find that their combined cumulative effect requires reversal. We disagree. Based on the entirety of the record, the asserted errors were not prejudicial even considered cumulatively.

### G. Other Contentions

Defendant reiterates numerous other contentions about the death penalty's constitutionality that we have considered and rejected many times. We see no reason to reconsider our precedent rejecting those claims.

Defendant argues that section 190.3, factor (a) (jury could consider circumstances of the crime), factor (b) (jury could consider criminal acts involving

the express or implied use of violence as aggravating), factor (c) (jury could consider prior convictions as aggravating, and factor (i) (jury could consider defendant's age in its sentencing determination) each violates the state and federal Constitutions for various reasons. We have previously rejected the identical claim that factor (a) is arbitrary and capricious in application. (*People v. Schmeck* (2005) 37 Cal.4th 240, 304-305 (*Schmeck*).) We also do not require a unanimity instruction before the jury can consider aggravating evidence under factors (b) and (c). (*Collins*, *supra,* 49 Cal.4th at p. 261.) These factors also do not put defendant in double jeopardy or violate Eighth Amendment principles. (*People v. Bacigalupo* (1991) 1 Cal.4th 103, 134-135.)

Additionally, the court's failure to delete inapplicable factors or otherwise specify a burden of proof as to mitigating and aggravating factors does not render the standard penalty phase instruction under CALJIC No. 8.85 vague or arbitrary. (*People v. Cruz* (2008) 44 Cal.4th 636, 680 [§ 190.3, factor (a) not unconstitutionally vague or overbroad]; *Schmeck*, *supra*, 37 Cal.4th at p. 305 [no constitutional violations for failure to delete inapplicable factors or specify the burden of proof].) Nor do we require a jury to make the aggravating and mitigation circumstances findings, other than section 190.3, factors (b) and (c), beyond a reasonable doubt. (*Kansas v. Carr* (2016) 577 U.S. ___ [136 S.Ct. 633, 642 [capital sentencing courts not required " 'to affirmatively inform the jury that mitigating circumstances need not be proved beyond a reasonable doubt' "]; see *People v. Taylor* (2010) 48 Cal.4th 574, 662 (*Taylor*).)

Defendant's additional claim that the jury is required under the federal Constitution to make written findings is without merit. (*People v. Nelson* (2011) 51 Cal.4th 198, 225-226.) The same is true of defendant's claim that the standard penalty instructions violate the federal Constitution because they allegedly fail to

51

direct the jury that if it determines mitigating factors outweigh aggravating factors, it must return a sentence of life without parole. (*People v. McWhorter* (2009) 47 Cal.4th 318, 379.) Nor do we find that the penalty "instruction that jurors may impose a death sentence only if the aggravating factors are so substantial in comparison to the mitigating" factors creates an unconstitutionally vague standard. (*People v. Carrington* (2009) 47 Cal.4th 145, 199.)

Our refusal to conduct intercase proportionality review does not violate the federal Constitution. (*Carrington*, *supra,* 47 Cal.4th at p. 199.) We also do not require the disparate sentence review that is afforded under the determinate sentence law. (*Collins*, *supra*, 49 Cal.4th at p. 261.) Additionally, our death penalty scheme does not violate international law and is not otherwise contrary to international norms. (*People v. Blacksher* (2011) 52 Cal.4th 769, 849.) Defendant also recognizes that we have rejected his assertion numerous times that the death penalty violates the Eighth Amendment's proscription against cruel and unusual punishment. (See *Taylor*, *supra*, 48 Cal.4th at p. 663.) Because defendant has identified no unconstitutional aspect of our state sentencing scheme, we find no defective cumulative impact or violation of our death penalty law under the Eighth and Fourteenth Amendments.

## IV. CONCLUSION

Based on the foregoing discussion, we affirm the judgment in its entirety.

CHIN, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
WERDEGAR, J.
CORRIGAN, J.
LIU, J.
CUÉLLAR, J.
KRUGER, J.

52

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Williams

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S131819
**Date Filed:** December 5, 2016

_____

**Court:** Superior
**County:** San Diego
**Judge:** David J. Danielson


_____

**Counsel:**

Paul J. Spiegelman, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Holly D. Wilkens, Theodore M. Cropley and Scott C. Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Paul J. Spiegelman
P.O. Box 22575
San Diego, CA  92192-2575
(858) 452-7121

Scott C. Taylor
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 738-9135