Filed 5/1/25  P. v. Minchaca CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>KENNY MINCHACA, JR.,<br><br>    Defendant and Appellant. | G062776<br><br>(Super. Ct. No. FSB20004362)<br><br>O P I N I O N |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSHUA ANTHONY GUERRERO,<br><br>    Defendant and Appellant. | (Super. Ct. No. FSB20004363) |

Appeals from judgments of the Superior Court of San Bernardino County, Ronald M. Christianson, Judge. Affirmed in part, reversed in part.

Law Office of Alex Coolman and Alex Coolman, under appointment by the Court of Appeal, for Defendant and Appellant Kenny Minchaca, Jr.

Johanna Pirko, under appointment by the Court of Appeal, for Defendant and Appellant Joshua Anthony Guerrero.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina, Stephanie H. Chow and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Kenny Minchaca, Jr., and Joshua Anthony Guerrero appeal after a jury convicted them of first degree felony murder with various firearm enhancements. The jury also found them guilty of being felons in possession of firearms and that the murder and possession offenses were committed for the benefit of a criminal street gang.

Guerrero contends his first degree felony-murder conviction must be reversed because the court committed prejudicial error by admitting Minchaca's out-of-court statements concerning their involvement in the murder as declarations against penal interest. (Evid. Code, § 1230.) Guerrero asserts without these statements the evidence was insufficient to support his felony-murder conviction. He also argues the gang enhancements on his convictions must be vacated because of instructional error. Minchaca joins in this last argument.

Minchaca contends the court abused its discretion by denying a mistrial motion after the late discovery a prosecution witness was a paid police informant. In his opening brief, Minchaca also asserted the bifurcation

2

provisions in Penal Code section 1109[1] applied retroactively and the failure to bifurcate the gang enhancements required the reversal of the substantive counts. He withdrew this argument after our Supreme Court's decision in *People v. Burgos* (2024) 16 Cal.5th 1.

We agree the gang enhancements must be reversed due to instructional error. We vacate the defendants' sentences and remand for the potential retrial of the gang allegations but otherwise affirm the judgments.

FACTUAL AND PROCEDURAL BACKGROUND

I.

THE MURDER

Video surveillance at a San Bernardino motel shows a black car pull into the parking lot at 9:02 p.m. on October 8, 2020. S. Ginez, who had been staying at the motel earlier that day, gets out of the car and walks to the motel's night window. The car's driver, Minchaca, reparks the car by backing into a spot near room 137. Ginez returns to the car after about three and a half minutes; Minchaca, and the rear passenger, Guerrero, then exit the car wearing face coverings and walk up to room 137. Minchaca knocks on the door and motions for Guerrero, who is holding a sawed-off shotgun, to stand to the side of the door. Minchaca knocks several times. When the door starts to open, Minchaca and Guerrero enter the room.

The room's interior cannot be seen in the surveillance video. However, the video shows swinging arms and the movement of feet in and near the room's doorway, suggesting a struggle in the room. Guerrero backs out of the room and points the shotgun into the room. Minchaca and Guerrero

---

[1] Further undesignated references are to the Penal Code.

3

then run to the car, and Minchaca puts a handgun in the front of his pants. The two men get inside the car and drive away at 9:08 p.m.

Motel occupants called the police, who responded and found the victim, Marvin Gundlach, dead from a shotgun wound to the chest. Gundlach's wallet, laptop computer, cellular phone, and bicycle were in the room.

## II.

### THE INVESTIGATION

Homicide detective Darren Sims responded to the motel and viewed the surveillance video. After watching the video, he determined the black car was a four-door Mercedes Benz with some distinct characteristics. He was also able to get the car's license plate number.

The following day, a police officer in an unmarked car saw Minchaca driving the black Mercedes Benz seen in the motel's surveillance video. The police surveilled the car until Minchaca got out and left as a passenger in a truck. The police impounded the black car and towed it to the police department.

Shortly after Minchaca got into the truck, a police officer conducted a traffic stop on the vehicle. When searching the truck, the police found a loaded firearm under the passenger side floormat, where Minchaca had been sitting. Minchaca was transported to the police station, where he was interviewed by Sims.

Seeing Minchaca in person, Sims observed Minchaca's appearance matched that of the car's driver from the surveillance video. While Minchaca was at the police station, he received numerous communications on his cellular phone through a social media application.

Sims noticed one of the notifications was from "Ant Guerrero," whose profile picture roughly matched the shooter's appearance.

Sims found Minchaca and Guerrero on the social media application and with a search warrant, obtained their profile information and communications. The social media records included photographs of Minchaca and Guerrero together and communications between them. In one photograph Minchaca sent Guerrero, Minchaca has two handguns and is making a gang sign with his hand. About a week before the homicide, Guerrero sent Minchaca a video of a 12-gauge shotgun shell being rolled on a surface. Guerrero received a video taken by someone else of him holding a sawed-off shotgun and Minchaca holding a handgun.

The police also looked for evidence of a motive in the social media records. In a message thread about a month prior to the homicide, Guerrero stated he was broke, just got kicked out of his room, and was with two people he was "probably going to rob" that night. Guerrero's social media records showed that less than three weeks prior to the homicide he was involved in a high-speed chase. He got away, but in the process, he injured his arms and hands, lost his friend's truck he was driving, and threw away two guns. His messages after the chase show he was looking to buy guns because the guns he lost belonged to someone else and "they [were] not happy." He stated they wanted four because he lost two. He also promised to repay his friend for the truck. Guerrero indicated in a message Minchaca and Ginez said they would pay for the guns.

About eight days prior to the homicide, Guerrero indicated in a message he had a shotgun and wanted to shorten its barrel. A few days later, he sent a photograph of a shotgun with the barrel still intact. The day before the murder, Guerrero said, in a message, he had his shotgun with him.

Around noon the day of the murder, Guerrero and Minchaca exchanged messages. At 7:59 p.m., Ginez sent Guerrero a message she needed a ride to go get her stuff. She was at a location about a mile from the motel where the murder later occurred. Guerrero immediately answered, "We are coming." Around 8:40 p.m., Ginez responded to a message from Guerrero and indicated she still needed a ride. At 8:51 p.m., Guerrero sent her a message stating, "Coming up," and then at 8:56 p.m., he stated they were outside. At 8:57 p.m., she replied, "Coming." A few minutes later, she is seen getting out of the black car at the motel where the murder occurred.

The social media records showed communication between Guerrero and Minchaca after the murder, first at 1:40 a.m., and about an hour later, Guerrero sent Minchaca a message, stating: "Bro I love you foo you are my real brother I'll be mad asf if anything happens to you now you know wassup but keep in contact I'll let you know what happens on my end okay . . . ."

The police processed the black car Minchaca drove at the time of the murder for forensic evidence. Minchaca's deoxyribonucleic acid (DNA) was found on the car's exterior driver door handle. Guerrero's DNA and that of two others were on the car's interior rear driver's side door handle and seatbelt.

III.

MINCHACA'S STATEMENTS TO A CONFIDENTIAL WITNESS
AND SUBSEQUENT GUN POSSESSION

The day after the murder, following the traffic stop of the truck, Minchaca was arrested for possession of a firearm. After he bailed out, he talked to a confidential witness (CW) and others who were at his residence.

CW was a convicted felon and associated with members of Westside Verdugo, a criminal street gang.

Minchaca told CW he killed a guy inside a motel room. He said he and "Oso," who CW identified as Guerrero, went to the motel to rob someone but it "went wrong" and they killed him. Minchaca asserted the victim was fighting back and they did what they had to do. Minchaca stated he was the one who shot and killed the victim. He told CW the person got aggressive and he had to shoot him. Minchaca claimed responsibility for what happened. He appeared anxious when talking about the incident because he believed the police were after him.

CW subsequently told Sims about Minchaca's statements, after she was detained at an illegal gambling establishment raided by the police. After talking to the police about this case, CW became a paid informant for the San Bernardino Police Department.[2]

On December 3, 2020, nearly two months after the murder, an officer conducted a traffic stop on a car in which Minchaca was riding as a passenger. After Minchaca was removed from the car, a loaded pump-action shotgun was found on the vehicle's floorboard. The shotgun's serial number had been removed, and the number seven and "ESV" were etched into the gun.

IV.

THE CHARGES AND TRIAL

Minchaca and Guerrero were charged with Gundlach's murder (§ 187, subd. (a); count 1). The second amended information alleged

---

[2] CW's status as a paid police informant was not timely disclosed, as discussed *post*.

numerous firearm enhancements, including: both defendants were armed with firearms (§ 12022, subd. (a)(1)), personally used firearms (§ 12022.53, subd. (b)), carried a firearm on their person and in a vehicle (§ 12021.5, subd. (a)), a principal personally used a firearm (§ 12022.53, subds. (b), (e)(1)), a principal intentionally discharged a firearm (§ 12022.53, subds. (c), (e)(1)), a principal personally and intentionally discharged a shotgun causing death (§ 12022.53, subds. (d), (e)(1)), and Guerrero personally and intentionally discharged a shotgun causing death (§ 12022.53, subds. (c), (d)). In count 2, Guerrero was charged with possession of a firearm by a felon, and Minchaca was charged with the same offense in counts 3 and 4 (§ 29800, subd. (a)(1)). The information alleged all the offenses were committed for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1)(A) & (C).) As to counts 1, 3, and 4, it was alleged Minchaca had two prior convictions that qualified as prior serious felonies (§ 667, subd. (a)(1)) and "strikes" under the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)).

During the joint trial, to prove the charges, the prosecution presented the motel surveillance video, testimony concerning the police investigation, Minchaca's statements to CW, and Minchaca's and Guerrero's social media records. As to the gun possession charges, the parties stipulated Minchaca and Guerrero were convicted felons "at all relevant times." The parties also stipulated the Mount Vernon clique of Westside Verdugo is a criminal street gang as defined in section 186.22. The prosecutor stated they intended the stipulation to encompass Assembly Bill No. 333's (2021–2022 Reg. Sess.) (Assembly Bill 333) then-upcoming amendments to the definition of a criminal street gang in section 186.22. (Stats. 2021, ch. 699.)

Sims, the prosecution's gang expert, testified in his opinion, Minchaca was an active member of the Westside Verdugo Mount Vernon

clique at the time the murder was committed because Minchaca had tattoos consistent with membership in the gang; in 2013, he had gang paraphernalia and writings related to the gang in his room; in 2016, he admitted being a member; he was arrested about two months after the murder with a shotgun that had the gang's symbols etched on it; and there were references to the gang in his social media postings.

Sims, however, did not believe Guerrero was a member of the Westside Verdugo gang. Instead, he believed Guerrero was an associate of the gang. This belief was based on Guerrero's association with Minchaca and his presence in photographs where Minchaca was "throwing" gang signs. But Guerrero did not have any tattoos indicating gang membership and he, himself, did not make gang signs in the photographs.

Presented with a hypothetical based on the evidence presented, Sims opined the gang member and associate committed the robbery for the benefit of, at the direction of, or association with a criminal street gang and with the specific intent to promote, further, or assist criminal conduct by the gang's members. He also testified gang members carry guns to be used for offensive purposes, like intimidating a robbery victim, and defensive purposes, like protection when selling narcotics.

The jury convicted Guerrero of first degree felony murder and, in a special finding, found he was the actual killer. The jury convicted Minchaca of first degree felony murder and found he was a major participant who acted with reckless indifference to human life in the attempted robbery of Gundlach. The jury found true multiple firearm allegations connected to the murder offense. The jury also convicted the defendants of the firearm possession charges and found all four offenses were committed for the benefit of a criminal street gang.

9

Minchaca waived his right to a jury trial on the prior conviction allegations, and a court trial was conducted. The court found the prior conviction allegations to be true. At sentencing, pursuant to the Three Strikes law, the court imposed a term of 75 years to life on the murder conviction and a consecutive term of 25 years to life for the gang firearm enhancement (§ 12022.53, subds. (d), (e)(1)). The court stayed the other firearm enhancements, and the term for the gang enhancement on the murder conviction was stayed under section 654. As to the firearm possession conviction in count 3, the court imposed a term of 25 years to life and four years for the gang enhancement on this count but stayed these terms under section 654. As to the firearm possession conviction in count 4, the court imposed a consecutive term of 25 years to life and imposed an additional one year for the gang enhancement on this count. The court also imposed 10 consecutive years for the two prior serious felony enhancements. Minchaca's total sentence was 125 years to life, plus 11 years.

As to Guerrero, the court imposed 25 years to life for the murder conviction, a consecutive term of 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)), and an additional 10 years for the gang enhancement, for a total term of 50 years to life plus 10 years. The court stayed the remaining firearm enhancements. For count 2, the court imposed a three-year term for the firearm possession conviction and a four-year term for the gang enhancement but stayed these terms under section 654.

## DISCUSSION

### I.

#### ADMISSION OF TESTIMONY UNDER EVIDENCE CODE SECTION 1230

Guerrero contends the court abused its discretion by admitting CW's testimony concerning Minchaca's statements to her under the

10

declaration against penal interest exception. (Evid. Code, § 1230.) Guerrero asserts this testimony was critical evidence in the jury finding him guilty of felony murder, and therefore, the erroneous admission of this evidence requires his murder conviction be reversed. We disagree. We conclude the court properly admitted the testimony under Evidence Code section 1230.

A. *Additional Background*

Prior to trial, the prosecution sought admission of out-of-court statements Minchaca made to CW about the murder as declarations against penal interest. In his written motion, the prosecutor explained Minchaca told CW he and Guerrero attempted to rob the victim but it went bad and the victim fought back. Minchaca told CW he and Guerrero were responsible for the murder and Minchaca admitted using a shotgun. The prosecutor argued Minchaca's statements to CW inculpating himself and Guerrero in the murder were declarations against Minchaca's penal interest as "[a] reasonable person would not have made those statement unless they were true . . . ." The prosecutor asserted the statements were reliable as they were corroborated by the physical evidence and the context and timing in which the statements were made also bolstered their reliability.

Over the objection of Guerrero's counsel, the court ruled the evidence was admissible. The court indicated, "[b]ased on the briefing," the statement was admissible as to both defendants. The court found Minchaca's statements to CW were declarations against interest and trustworthy.

During the trial, the prosecution's gang expert testified, on cross-examination, it is part of gang culture for gang members to boast about their crimes, how they occurred, and to exaggerate and lie about their own participation in the crime. Based on this testimony, Guerrero's counsel moved for a mistrial, arguing Minchaca's statements were not statements against

11

penal interest and the court should have excluded CW's testimony concerning Minchaca's statements. The court found Minchaca's statements were admissible as to both defendants and denied the mistrial motion.

*B. Governing Principles*

Minchaca's statements to CW were hearsay as they were out-of-court statements offered for the truth of the matter stated. (Evid. Code, § 1200.) While hearsay is generally inadmissible (*ibid*.), an out-of-court statement against the declarant's penal, pecuniary, proprietary, or social interest, may be admissible under Evidence Code section 1230, an exception to the hearsay rule. (*People v. Masters* (2016) 62 Cal.4th 1019, 1055 (*Masters*); *People v. Smith* (2017) 10 Cal.App.5th 297, 303.) This "exception permits the admission of any statement that 'when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected [the declarant] to the risk of civil or criminal liability, . . . or created such a risk of making [the declarant] an object of hatred, ridicule, or social disgrace in the community, that a reasonable [person] in [that] position would not have made the statement unless [the declarant] believed it to be true.' (Evid. Code, § 1230.) As applied to statements against the declarant's penal interest, in particular, the rationale underlying the exception is that 'a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest,' thereby mitigating the dangers usually associated with the admission of out-of-court statements." (*People v. Grimes* (2016) 1 Cal.5th 698, 710–711 (*Grimes*).)

"To demonstrate that an out-of-court declaration is admissible as a declaration against interest, '[t]he proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was

12

sufficiently reliable to warrant admission despite its hearsay character.' [Citation.] 'In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.'" (*Grimes, supra*, 1 Cal.5th at p. 711.)

"We review a trial court's decision whether a statement is admissible under Evidence Code section 1230 for abuse of discretion" (*Grimes, supra*, 1 Cal.5th at p. 711), and we will not disturb the court's decision ""'"except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."'"" (*Masters, supra*, 62 Cal.4th at p. 1056.)

*C. The Trial Court Properly Admitted the Testimony*

Guerrero contends the court erred by admitting Minchaca's statements to CW under Evidence Code section 1230 because "considered in context and in light of the testimony of the prosecution gang expert, Sims, and the prosecutor's closing argument, it is apparent that Minchaca's statements to CW would have advanced his standing within the gang, were not 'trustworthy,' and would not have made him 'an object of hatred, ridicule, or social disgrace in the [relevant] community.'" Guerrero's appellate contention is premised on the gang expert's testimony and the prosecutor's closing argument—things that took place after the trial court ruled the evidence admissible. Our review of a trial court's ruling on the admission of evidence "is limited to the evidence before the court when it heard the motion." (*People v. Hartsch* (2010) 49 Cal.4th 472, 491.) Here, the court ruled on the pretrial motion based on the prosecutor's offer of proof. Thus, the gang

expert's testimony and the prosecutor's closing argument are immaterial to the court's initial ruling on the evidence's admissibility.

Looking at the evidence before the court when it ruled, we conclude the court properly admitted Minchaca's statements to CW under Evidence Code section 1230. First, Minchaca was unavailable to testify as he was a defendant in the case and had a constitutional right not to be called as a witness and not to testify. (*People v. Merfeld* (1997) 57 Cal.App.4th 1440, 1443.) Second, Minchaca's statements to CW were declarations against his penal interest as a reasonable person in Minchaca's position would believe his admissions to CW would subject him and Guerrero to criminal liability for Gundlach's murder. When Minchaca made the statements, according to the prosecutor's proffer, Minchaca was panicked because he had been released from custody on other charges and feared being arrested for the murder for which he and Guerrero were responsible. Minchaca was concerned he was going to be charged with the murder; thus he was cognizant of the criminal liability he faced when he made the statements. Minchaca did not try to minimize his role or shift the blame to Guerrero. "[A] statement is more likely to satisfy the against-interest exception when the declarant accepts responsibility and denies or diminishes others' responsibility." (*Grimes, supra*, 1 Cal.5th at p. 716.) Thus, the court properly found Minchaca's statements were against his penal interest.

Third, the prosecution showed Minchaca's statements to CW were "'sufficiently reliable to warrant admission despite [their] hearsay character.'" (*Grimes, supra*, 1 Cal.5th at p. 711.) The prosecution's proffer indicated Minchaca and Guerrero's involvement in the murder was corroborated by physical evidence and the context in which the statements were made provided indicia of reliability. Minchaca made the statements to

14

friends and people he trusted within a few months of the murder. ""Declarations against penal interest are received notwithstanding that they were spoken in confidence in the expectation they would not be repeated to the authorities. [Citations.] Indeed, that makes such declarations more trustworthy."" (*Masters, supra*, 62 Cal.4th at p. 1056.)

Accordingly, the court properly admitted Minchaca's statements to CW under Evidence Code section 1230 as declarations against interest. Because the evidence was properly admitted, there is sufficient evidence to support Guerrero's felony-murder conviction. He does not contend otherwise.

II.

DENIAL OF MISTRIAL MOTION

Minchaca contends the court abused its discretion by denying a mistrial motion, which was based on the late discovery CW, who testified Minchaca confessed to the murder, was a paid police informant. He asserts the court's curative actions were insufficient because the jury was not informed of this impeachment evidence until several days after CW's testimony. The Attorney General argues the court's corrective actions were sufficient and the court properly denied the mistrial motion. We agree with the Attorney General.

*A. Additional Background*

On November 29, 2021, CW testified Minchaca made statements to her inculpating himself and Guerrero in Gundlach's murder at the motel. During her testimony, some impeaching evidence was elicited, including she was a convicted felon, she was on probation, and she was potentially in "some trouble" when she spoke to Sims about this case. But she denied she talked to Sims because she was afraid she was going to get into trouble for violating

15

her federal probation. She disavowed the police did her "any favors after" she came forward and implicated Minchaca.

On redirect, the prosecutor attempted to clarify why CW came forward with information in the case, eliciting testimony she told Sims she wanted to help because she had friends who were shot and killed. CW testified the reason she talked to Sims about what she heard Minchaca say was her cousin was shot and they had not found his killer.

After each party rested its case, the court instructed the jury on the law and informed the jury closing arguments would be heard the following day, December 2, 2021.

The following morning, before closing arguments were to begin, the prosecutor informed the court he just learned CW was a paid confidential informant for the San Bernardino Police Department. He proffered when CW first spoke to Sims about this case, she was not an informant but became one sometime after that and provided information to the police department regarding certain individuals and criminal activity. The prosecutor indicated he did not have the full details and Officer Grant Miles, who had been acting as CW's handler, could provide further information.

The court stated its intent to reopen for further examination of CW and to hear Miles's testimony. Both Guerrero and Minchaca moved for a mistrial. The court denied the motions because it concluded the late discovery could be cured by reopening the evidence and instructing the jury further on the credibility of witnesses and on the prosecution's late disclosure. The court indicated the jury would be released for the day and ordered to return on December 8 for further testimony because the court was unavailable until that day. The court rejected the suggestion of Minchaca's counsel that the court read the late discovery instruction to the jury before releasing them

16

that day. The court, instead, informed the jury an issue had arisen that required additional testimony and they would hear this testimony and receive more instructions regarding the evidence on December 8.

CW was recalled as a witness on December 8. She was in custody on a federal probation violation hold. She testified that after speaking to Sims she contacted Miles about five days later because she wanted to become a paid confidential informant. She talked to Miles about the case, and he paid $300 for the information she already provided. She signed up with the police department as a confidential informant on December 21, 2020. She provided information to Sims and Miles concerning the defendants' involvement in the murder and received additional payments. The information she provided Miles related only to this case. She did not recall giving Miles information about other individuals unrelated to this case.

Miles testified he met CW on December 16, 2020, when he was serving a search warrant on a location where illegal gambling was taking place. CW lived at the location and was detained during the search. While he was interviewing her, she stated she had possible information about a murder and mentioned Minchaca. She indicated she was willing to speak to a detective about the case and she was transported to the police station.

Miles contacted CW in the following days about her being an informant, and he ultimately became her handler. She signed an agreement to be a confidential informant for the police department and was paid $300. Pursuant to the agreement, CW would provide information about subjects committing crimes, and if the information led to seizures, arrests, or search warrants, she would be paid money. On January 7, 2021, the police department gave her $100 to pay her phone bill so she could stay in contact with them concerning the ongoing investigation in this case. On subsequent

17

dates in January, April, and May 2021, the police department paid CW money for information unrelated to this case. Miles did not tell Sims CW had signed up as a paid informant. Miles assumed Sims knew CW was an informant and Sims would tell the prosecutor.

Sims was also recalled to testify. He testified he gave CW's phone number to a narcotics division sergeant at the conclusion of his interview with her because she requested to speak to Miles further. He did not vouch for her as a potential informant. He did not find out she was a paid informant for his police department until the morning of December 2, 2021.

The court gave the jury additional instructions relating to CW's testimony. It added a factor to the instruction on witness credibility (CALCRIM No. 226), telling the jury an additional factor it might consider was whether "the witness [was] promised any type of special treatment or provided any incentive in exchange for his or her testimony." Using a modified version of CALCRIM No. 306, the court instructed the jury the prosecution failed to timely disclose to the defense information about CW's status as a paid police informant.[3]

Guerrero's counsel renewed his mistrial motion, based on the admission of Minchaca's hearsay statements to CW, who counsel described as "a thoroughly tainted source for information." Counsel argued the evidence

---

[3] The court instructed the jury as follows: "Both the People and the defense must disclose their evidence to the other side before trial within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence to counter opposing evidence or to receive a fair trial. [¶] Within the legal time period, the People failed to disclose to the defense information about [CW] working as a paid informant for law enforcement. In determining the weight and significance to give to this evidence, you may consider the effect, if any, of that late disclosure."

18

concerning Minchaca's statements was "enormously prejudicial" and had little probative value. The court denied the motion.

*B. Governing Principles*

Minchaca contends the court erred by refusing to grant a mistrial. "[A] court should grant a mistrial if it "'is apprised of prejudice that it judges incurable by admonition or instruction.'" [Citation.] Whether an incident is prejudicial and requires a mistrial is 'by its nature a speculative matter,' and the "'trial court is vested with considerable discretion in ruling on mistrial motions.'" [Citation.] Thus, courts should grant a mistrial when defendant's """'chances of receiving a fair trial have been irreparably damaged.'"""" (*People v. Williams* (2016) 1 Cal.5th 1166, 1185.) We review the trial court's refusal to grant a mistrial motion under the abuse of discretion standard. (*People v. Ng* (2022) 13 Cal.5th 488, 561.)

*C. The Trial Court Properly Denied the Mistrial Motion*

Minchaca contends the court abused its discretion by denying the mistrial motion because CW's testimony was "extremely damaging" and the jury was exposed to her testimony for several days before the full context of her involvement was provided.[4] He asserts "it was impossible to undo the structural impact of [CW's] role on the case merely by permitting her to be impeached after the fact" and the court's additional instructions did not cure the harm. We find no abuse of the court's discretion.

---

[4] Minchaca argues "the denial of the mistrial motion should be assessed at the time it was made by counsel for Guerrero on December 8." He acknowledges his counsel did not formally join in that motion but made a prior mistrial motion that was denied, and Minchaca asserts a further objection would have been futile. The Attorney General does not argue Minchaca forfeited his appellate argument by failing to join in the December 8 mistrial motion; thus, we will address the issue on its merits.

19

The court exercised its sound discretion in concluding a mistrial was unwarranted. The court properly managed the issue by reopening the evidence, having CW, Miles, and Sims testify further, and by providing the jury further instructions relating to the late disclosure and witness credibility. (See *People v. Collins* (2010) 49 Cal.4th 175, 198–199 [trial court did not abuse its discretion by denying mistrial motion because prejudicial effect of testimony could be cured by admonition].)

Minchaca contends "[t]he amount of time the jury was exposed to [CW's testimony Minchaca admitted committing the felony murder] before learning that CW was a paid informant, in itself, is indicative of its potential to cause prejudice, regardless of the court's eventual efforts to repair that damage." Although there was a span of six court days between CW's initial testimony concerning Minchaca's admission and the new evidence of her status as a paid police informant, we do not see how this length of time prejudiced the defendants or diminished the court's curative actions. The court was unavailable during this time, and the additional days provided the defendants time to prepare their cross-examinations based on the newly discovered evidence. The defendants were able to thoroughly cross-examine CW, Miles, and Sims and elicited evidence severely damaging CW's

credibility. The court's actions cured any prejudice caused by the late disclosure of CW's status as a paid police informant.[5]

Earlier access to the information concerning CW's status as a paid police informant would not have altered the outcome of the trial. The jury saw videos showing both defendants' involvement in the murder. Minchaca's argument earlier disclosure of this evidence might have altered the trial strategy of Minchaca's counsel is purely speculative and not grounds for reversal. We conclude the court properly exercised its discretion by denying the mistrial motion.

## III.

### GANG ENHANCEMENTS

Guerrero argues the gang enhancement findings on his convictions must be reversed because changes to section 186.22 resulting from the enactment of Assembly Bill 333 apply retroactively to his trial and the jury was instructed under the prior law. Specifically, he notes the jury was not instructed on the new requirement the prosecution must prove the

---

[5] In his reply brief, Minchaca contends "[t]he nature of the problem . . . was more akin to a violation of . . . *Brady v. Maryland* (1963) 373 U.S. 83," and he presented a similar contention at oral argument. By failing to raise this argument in his opening brief, Minchaca has forfeited this claim. (*People v. Taylor* (2020) 43 Cal.App.5th 1102, 1114.) In any event, the *Brady* claim is meritless. "[E]vidence that is presented at trial is not considered suppressed, regardless of whether or not it had previously been disclosed during discovery." (*People v. Morrison* (2004) 34 Cal.4th 698, 715.)

benefit to the gang from his offenses was more than reputational. (§ 186.22, subd. (g).) Minchaca joins in this argument.[6]

The Attorney General agrees Assembly Bill 333's changes to section 186.22 apply retroactively but asserts the instructional error was harmless. We conclude the gang enhancements must be reversed, and the matters remanded for further proceedings.

A. *Governing Principles*

Section 186.22 "makes it a crime to actively participate in a 'criminal street gang,' and the statute provides for enhanced punishment when a defendant is convicted of an enumerated felony committed 'for the benefit of, at the direction of, or in association with any criminal street gang.'" (*People v. E.H.* (2022) 75 Cal.App.5th 467, 476.) "Effective January 1, 2022, Assembly Bill No. 333 amended section 186.22's definition of a 'criminal street gang.'" (*People v. Lamb* (2024) 16 Cal.5th 400, 448 (*Lamb*).) As relevant here, "Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.'" (*People v. Tran* (2022) 13 Cal.5th 1169, 1206 (*Tran*).) The statute now requires the jury find that when the defendant committed the offense for the benefit of or in association with a criminal

_____

[6] Minchaca did not raise this issue in his opening brief and his effort in his reply brief to join Guerrero's argument was inadequate. (*People v. Smithey* (1999) 20 Cal.4th 936, 1017, fn. 26 [generally, "'points raised in the reply brief for the first time will not be considered'"]; *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364 ["'Joinder may be broadly permitted [citation], but each appellant has the burden of demonstrating error and prejudice'"].) The Attorney General was given an opportunity, but declined, to brief whether the gang enhancements imposed on Minchaca's convictions must be reversed because the jury was instructed on the former elements of section 186.22.

22

street gang, "the defendant intended to assist, further, or promote criminal conduct by gang members" and "[t]o benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational." (§ 186.22, subd. (g), as amended by Stats. 2021, ch. 699, § 4; CALCRIM No. 1401.) "The revised statute also provides, '[e]xamples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant.'" (*Lamb, supra*, 16 Cal.5th at p. 448.)

"By requiring proof for a gang enhancement that the benefit to the gang was more than reputational, Assembly Bill No. 333 essentially adds a new element to the enhancement." (*People v. Sek* (2022) 74 Cal.App.5th 657, 668.) Here, the trial occurred prior to Assembly Bill 333's effective date, and the court instructed the jury with the 2016 version of CALCRIM No. 1401, which did not include this new element. The parties agree, as do we, Assembly Bill 333's amendments to the definition of a criminal street gang in section 186.22 apply retroactively to this appeal. (*Tran, supra*, 13 Cal.5th at pp. 1206–1207; *In re Estrada* (1965) 63 Cal.2d 740.)

"When jury instructions are deficient for omitting an element of an offense, they implicate the defendant's federal constitutional rights, and we review for harmless error under the strict standard of *Chapman v. California* (1967) 386 U.S. 18." (*People v. Sek, supra*, 74 Cal.App.5th at p. 668; accord, *Lamb, supra*, 16 Cal.5th at p. 448; *Tran, supra*, 13 Cal.5th at p. 1207.) "In this assessment, we 'conduct a thorough examination of the record. If, at the end of that examination, [we] cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for

23

example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—[we] should not find the error harmless.' [Citation.] Conversely, where we conclude 'beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless.'" (*Lamb*, at p. 449.)

"'In assessing prejudice in this context, the question is not whether there is evidence in the record that would support a jury finding of the missing element. Instead, we ask whether we can conclude beyond a reasonable doubt that "the jury verdict would have been the same" had the jury been instructed on the missing element.' [Citations.] 'Our task, then, is to determine "whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element."'" (*Lamb, supra*, 16 Cal.5th at p. 449.)

## B. The Omission of the Nonreputational Element Was Prejudicial

Here, we cannot say the error was harmless beyond a reasonable doubt as to the gang enhancements found true on Guerrero's robbery and firearm possession convictions. The prosecution's gang expert, when presented with a hypothetical reflecting the facts of this case and asked why a gang associate would commit an attempted robbery "with the specific intent to promote or further or assist criminal conduct by gang members," testified the crime could be "committed on a personal level" or for the associate to enhance his reputation with the gang and its members. The prosecution's gang expert also testified the gang associate committing the robbery with the gang member benefits the gang's reputation. The gang expert did not separately discuss how the associate using a gun in the robbery benefited the

24

gang other than reputationally. Based on the evidence in this case, a reasonable juror could have concluded Guerrero committed the robbery and possession offenses for his own personal reasons or to bolster his reputation and the gang's reputation.

The Attorney General asserts the error was harmless beyond a reasonable doubt because the prosecution did not emphasize the reputational evidence in its closing argument. The prosecution's failure to highlight an invalid theory or omitted element does not render the instructional error harmless. "It is elementary . . . that the prosecutor's argument is not evidence and the theories suggested are not the exclusive theories that may be considered by the jury." (*People v. Perez* (1992) 2 Cal.4th 1117, 1126.) While the gang expert testified the hypothetical robbery benefits the gang monetarily, we cannot "rule out the possibility that the jury relied on reputational benefit to the gang as its basis for finding the enhancements true." (*People v. Sek, supra*, 74 Cal.App.5th at p. 669.) The record contains evidence that could lead to a contrary finding as to whether the common benefit from the robbery and possession offenses was more than reputational. (*Lamb, supra*, 16 Cal.5th at p. 453.) Accordingly, the jury's true findings on the gang enhancements as to Guerrero's convictions must be reversed.

We reach the same conclusion at to the gang enhancement findings on Minchaca's convictions. The gang expert testified as to both reputational and nonreputational benefits to the gang from the robbery and possession offenses. Concerning the gang member's involvement in the hypothetical robbery, the gang expert testified the gang member benefits the gang's reputation and monetarily. Regarding the firearm possession offenses, the gang expert testified there is an expectation gang members carry guns for the gang for offensive and defensive purposes like protecting themselves

25

during narcotic sales or to intimidate a robbery victim. When asked if the transportation of a firearm by a gang member the day after a robbery was for the benefit of the gang, the expert testified "it could be for the benefit of the gang" as it would permit the gang member to commit other crimes of opportunity. On the record before us, where the jury heard evidence of both reputational and nonreputational benefits to the gang, we cannot conclude beyond a reasonable doubt the error was harmless. (*People v. E.H., supra*, 75 Cal.App.5th at p. 480.)

"The proper remedy for this type of failure of proof—where newly required elements were 'never tried' to the jury—is to remand and give the People an opportunity to retry the affected charges." (*People v. E.H., supra*, 75 Cal.App.5th at p. 480.) Thus, we reverse the true findings on the gang enhancements and remand for the prosecution to retry them if they elect to do so.

The reversal of the gang enhancements also invalidates the firearm enhancement imposed on Minchaca's murder conviction pursuant to section 12022.53, subdivisions (d) and (e)(1). (*People v. Montano* (2022) 80 Cal.App.5th 82, 104, disapproved on another ground in *People v Burgos, supra*, 16 Cal.5th at p. 31.) Should the prosecution elect to retry the gang enhancement allegations, we note the 10-year gang enhancement under section 186.22, subdivision (b)(1)(C) cannot be imposed on the first degree murder conviction because a life sentence is imposed on the murder and section 186.22, subdivision (b)(5) controls. (*People v. Lopez* (2005) 34 Cal.4th 1002, 1011.)

## DISPOSITION

The true findings on the gang enhancements as to both defendants are reversed, and their sentences are vacated. The matters are remanded to the trial court to provide the prosecution an opportunity to retry the defendants on the gang allegations. If the prosecution elects not to retry the gang allegations or at the conclusion of a retrial, the court shall impose an appropriate disposition. In all other respects, the judgments are affirmed.

MOTOIKE, ACTING P. J.

WE CONCUR:

DELANEY, J.

SCOTT, J.